McElroy *v.* Swope.

*(Circuit Court, W. D. Missouri, W. D.   September 7, 1891.)*

1. Exceptions to Master's Report.
    Although the master's report may be inaccurate in some statements of fact, or some fact may be omitted therefrom, yet, unless it appears that such defects are of substance, such as to work some material prejudice to the party excepting, whereby an unjust result is reached, a re-reference or vacation of the report should not be directed.

2. Partnership in Real Estate.
    There may be a partnership between parties to deal in lands; and the existence and terms thereof, by the great weight of authority, may be established by parol testimony, where the proof is clear. An agreement between A. and B. to speculate in land-titles, and divide the profits, in no wise conflicts with the statute of frauds, as no estate or interest in land has been granted, assigned, or declared.

3. Statute of Frauds—Sale of Lands.
    Where A. obtains for himself merely a proposition of sale of lands, and induces B. to take his place on the understanding that B. is to furnish the purchase money and take the title in his (B.'s) name, and afterwards let A. have a half interest on condition of A. paying or executing his note to B. for one-half the purchase money, it would be of the nature of a conditional sale, and within the statute of frauds.

4. Resulting Trust—Purchase of Land.
    Where title to real estate is taken in the name of A. there may be a resulting trust therein in favor of B., provable by parol testimony. But it is essential thereto that the trust must have arisen at the time the purchase was made, and the money or consideration must have been paid or secured to be paid by B. at or before the purchase.

5. Partnership—What Constitutes.
    Complainant and respondent entered into an arrangement to deal in lands affected with tax-titles, and neglected properties. The respondent was to furnish the purchase money, the titles to be taken either in the name of the complainant or a third person. The respondent was to pay for an abstractor to run chains of titles, etc. The complainant was to superintend the work, look up the owners of the property, conduct the negotiations for the purchase, and, when the title was acquired, he was to have a half interest; the one-half of the purchase money to be secured by him by giving his note therefor to respondent, with deed of trust on the half interest, the profits on resale to be equally divided. *Held* to constitute the parties partners in the lands so acquired.

6. Same.
    Where during such partnership the complainant, in the absence from the state of the respondent, negotiated on his own account for the purchase of a valuable body of land, but before the contract of purchase was reduced to writing the respondent appeared and insisted that he be admitted to the speculation as a partner, on the terms of their said joint arrangement, whereupon the contract of purchase was made in respondent's name, and the deed thereafter made to him, and the purchase money was paid by him, on the understanding, had before the completion of the purchase, that complainant was to have a half interest, the respondent to be secured for the one-half of the purchase money by deed of trust on one-half of the land, with interest at 6 per cent., *held* not to be subject to plea of statute of frauds. And further, where there is a conflict of testimony between the parties as to whether or

not this was a mere conditional sale or a purchase within the terms of the partnership agreement respecting other purchases, the court will look to the four corners of all the transactions, both prior and subsequent, of the parties, as well as their acts, conduct, and statements touching this purchase.

7. EQUITY—CONSTRUCTION OF TRANSACTION.

A court of equity should always refer the transaction to that construction, predicable upon evidence, which will prevent one of the parties from obtaining an unconscionable advantage of the other.

8. ACCOUNTING—IN EQUITY.

The respondent having sold part of the land, and having taken notes in his name for the deferred payments, in the accounting the court should, on the production of the note by the respondent, regard such note as a partnership asset, and direct a division of the proceeds realized out of it, rather than to treat the note as so much cash in the hands of the respondent.

(*Syllabus by the Court.*)

In Equity.  Bill to dissolve a partnership, and for an accounting.

*Cunningham & Dolan*, for complainant.

*Brumback & Brumback*, for defendant.

PHILIPS, J.  This is a bill in equity, asserting a partnership between the parties in certain real estate, praying for a dissolution of the partnership, and for an accounting.  The answer puts in issue the existence of the alleged partnership, particularly as to the lands constituting the principal matter of contention.  As to these the defendant pleads the statute of frauds in bar of the alleged partnership agreement.  The case was referred to George Fearons, Esq., special master in chancery, who has made report, finding the issue of partnership for the complainant, and rendering an accounting.  To this report respondent has presented 95 exceptions, occupying 338 pages of type-writing, supplemented with a printed brief covering 114 pages.  As the scope of these exceptions invited the court to a minute and careful perusal of about 900 pages of written evidence and about 85 exhibits, to say nothing of a very lengthy report by the master, it is unnecessary to suggest that the court's summer vacation has been most pleasantly occupied with this literary diversion.  That the court should be expected, in justice to other public duties and a proper regard to human endurance, to pass in detail upon these exceptions, is quite unreasonable.  That the master's report is not full in some material matters, and unnecessarily full in others, is not to be denied.  It is also to be conceded that there are some inaccuracies of statement and errors of fact in it; but unless it can be made to appear that these defects have wrought some material prejudice to one of the parties, such as a conclusion drawn from misstated facts, or a conclusion of law predicated thereon, or there be some important fact not found which should have been reported, whereby a different result should be reached, it is not perceivable why there should be a re-reference or vacation of the report.

In view of the bitter assault made upon the conduct of the master, and the severe arraignment of his findings, the court has taken upon itself the no little task of carefully reading the mass of evidence, with the determination to satisfy itself of the facts.  The master finds that in the month of February, 1888, the parties entered into an arrangement, having for its object the purchasing and selling of lands for a profit; and

that the business was conducted at Kansas City, Mo., throughout the year 1888, and extended into the year 1889; during which time they acquired many titles, made some sales, and earned large profits; and that in the property so acquired known as the "Campbell Lands" (the title to which was placed in the respondent) the respondent refuses to recognize the rights and interest of the complainant. It is found that the terms of this copartnership were, substantially, that Swope was to furnish the necessary money, on his consent, to effect the purchases and conduct the business; that complainant, McElroy, was to give the business his personal attention and services; that when a purchase was made on the money furnished by Swope, McElroy was to pay him current rate of interest, or 8 per cent., on the one-half thereof for an agreed period, giving to Swope a lien on his undivided half interest in the land as security.

We will review the evidence only so far as to discover whether or not the conclusion of the master is sustained by the weight of evidence. The complainant is a man 32 years of age. He possesses rare business qualifications, especially for the enterprise in question. He is shrewd, energetic, and pushing, and possessed an aptitude for such an adventure. This the respondent bore testimony to, as on one or more occasions during their operations he stated that if he had had the services of complainant earlier they could have made many hundred thousand dollars. The respondent is 63 years of age and unmarried. He is a citizen of Kentucky, but has practically made his home in Kansas City for 30 years, where he has accumulated a large fortune. He is a gentleman of liberal education, wide business experience and sagacity, and somewhat learned in the elementary principles of the law. The ready cash of the one, and his ambition for an ever-increasing fortune, and the necessities and business traits of the other, only needed an introduction to bring them together in a business adventure. In the early part of 1888 they bought a lot of ground in Kansas City known as the "Walnut-Street Property." Of this it is sufficient to say that it was bought and sold on speculation, and the profit was divided between them About the month of February, 1888, they got together, and formed a business arrangement, which I confess it were difficult to characterize in legal phrase if it were not a copartnership. The complainant's version of the preliminary negotiations is substantially as follows: During a conversation at Swope's private room, perhaps in January, or the forepart of February, 1888, Swope suggested that he believed a live firm could make a great deal of money by looking up neglected properties in and about the city; that in every large city there were more or less old bachelors, who lived alone, their relatives living elsewhere, and when they died their relatives did not learn of it for many years thereafter; in other instances parties who lived in Kansas City in early days had practically deserted their property about 1872-73, and they were sold for taxes, the parties not regarding them, in the depressed condition of real estate, as worth the taxes; that by looking up such parties or their heirs their interest might be purchased for an inconsiderable sum,—and proposed that complain-

ant go into partnership with him. At that time complainant was engaged with his brother, under the firm name of McElroy & Co., in real-estate business at Kansas City, and he suggested to respondent that the proposed partnership with him might materially interfere with his said business. To meet this objection Swope suggested that he owned a large amount of real estate in the city, which he rented, requiring the services of an agent, and that he would turn this business over to the firm of Mc-Elroy & Co., which rental roll amounted to about $3,500 per month; in addition to which he said he would furnish all the money to carry on the partnership, paying the expenses of abstractors, as an offset against complainant's time and services in looking up the properties, keeping the accounts with the abstractors, and having his (complainant's) type-writer copy chains of title, and the complainant to examine them. The complainant was to pay respondent 8 per cent. interest on one-half of the money furnished by respondent for a half interest in the property acquired by them.

Robert L. McElroy, a brother of complainant, testified that about the time named by complainant he was present at the private office of complainant, when the matter of the formation of the partnership between complainant and respondent was being discussed. His version of the conversation is as follows:

"Mr. James E. McElroy told me on entering the room that he had been talking with Swope on this matter of forming a partnership for the purpose of buying and selling land, about which he had before spoken to me. My brother then said to me that he did not know what the effect of the formation of such a partnership would have on the business of James E. McElroy & Co., when Mr. Swope spoke up and said that the firm of McElroy & Co. would lose nothing by the formation of this partnership; that he (Swope) would turn over to them all of his rental business, commissions on which would amount to several hundred dollars per month; also he would loan a great deal of money through the firm, and would throw all the business he could into the hands of the firm, the income of which would more than offset any disadvantages the firm would be placed under by the formation of the new partnership; and Mr. Swope also said that he had made a very liberal proposition to Mr. McElroy, and stated his proposition was this: That he would furnish all the money required to carry on the business, and that he would pay individually expense of abstracting and other expenses connected with the business, and that he would furnish all the money necessary to carry on the business; and that McElroy could secure him on his proportion of the purchase money of the properties by giving him a deed of trust on the property purchased, or by paying cash, if he so desired, for his half of the purchase money; and that McElroy on his part was to devote so much of his time to the business as might be required, without any charge while he was in the city, and a fair compensation when working outside of the city,—that is to say, when the business called him away, and kept him entirely outside of the city, and while so acting in the interest of the business of McElroy & Swope. It was agreed that the stenographer of McElroy & Co. should do such work as copying chains of title and the making of statements, writing letters, and all that class of work. There was to be no charge made against McElroy & Swope by McElroy & Co.; that was to be done in consideration of the fact that Mr. Swope was to throw his individual business to the firm of McElroy & Co."

The respondent does not deny that he engaged in business with complainant, but his contention is that it was not a partnership arrangement,—at least, to the extent claimed by complainant; that the arrangement was limited to lands affected with tax-titles, and none other; that when McElroy brought to his attention any such property, he determined for himself whether or not it was desirable, and bought on his own judgment, admitting McElroy as a tenant in common on condition of his paying or securing to him his half of the purchase money. The thirty-fifth paragraph of his answer states that—

"The charges made by said complainant for services rendered by him are wrongful in every particular, because there never was any agreement or understanding that he was to charge or be paid for his services; and, on the other hand, it was understood that he was not to make any charge for any services rendered by him, it being understood that the complainant was to furnish his services respecting the tax-title lands without charge as against the cost of the abstracting and abstract work to be paid, and which was paid, by defendant, amounting to a large sum."

The supreme court of the state had—perhaps a year prior to this—rendered a decision adverse to the validity of the form of deed employed by the tax collector of Kansas City. It is not improbable that the prospect of a harvest for speculation in such tax-titles moved the parties to the joint adventure. But the evidence is overwhelming that their joint operations extended to other property, and with the knowledge and acquiescence of the respondent. The evidence shows that the respondent, from various considerations of policy and expediency, sought to have his association with complainant in these speculations concealed from the public; and to this end cautioned various parties in the employ of the concern not to disclose his connection. The latter part of February active operations were begun. An abstractor was employed for one month, to be paid by Swope. This abstractor made out chains of titles to pieces of lands, as directed by McElroy, and the latter looked up the owners, and conducted the negotiations. The business grew so that the services of the first abstractor were not only continued, but additional force was employed, and over 1,000 pieces of property were examined by these employes, or, rather, as many chains of title were run out. Swope took such interest in this adventure that he kept an office in close connection with McElroy's. When McElroy moved his office from one place to another, Swope followed, having an office immediately connected with McElroy, having free and full access to the business of the titles examined. Their consultations were frequent, and intercourse, so far as matters of business were concerned, was close. During the business McElroy introduced Swope as his partner in business, without objection on Swope's part; and Swope on two occasions spoke of McElroy as his partner. Many tax-titles were acquired. The deeds were taken in the name of McElroy, or in that of one Brown, a lawyer, who was paid by the parties $100 per month for his services in holding these titles, and rendering some professional services. In case of litigation over the titles thus held by Brown, the parties agreed to indem-

nify him against costs and losses consequent thereon. In case of sale, the profits were divided equally. Titles to other lands than tax-titles were examined, and negotiations conducted with a view to their acquisition, and deeds taken to such. In one marked instance a lot was purchased by McElroy at a public sale under a foreclosure of a mechanic's lien, which was treated by the parties as within the terms of the "joint arrangement" by dividing the profits thereof. Different law firms were employed by complainant and respondent, to be paid by them; and these lawyers testify that there was no understanding that their services were to be limited to the matter of tax-titles, and their work extended in fact to other classes of titles.

In May, 1888, the principal bone of contention came into view,—the lots of ground known in this controversy as the "Campbell Lands." These lots, about 22 in number, are situated in the northern part of the city of Kansas, Mo., and belonged to the heirs of Robert Campbell, deceased. Some of them were improved, with buildings thereon, while some were vacant lots. The evidence tends to show that early after the abstractor was first employed the attention of McElroy was directed to this property by the discovery that some of the lots were affected by tax-titles. Later developments disclosed the fact, however, that these tax-deed incumbrances had been removed by a conveyance to the real owner by the tax purchaser; and when Swope's attention was drawn to these lands as a probable good field for speculation he discouraged it, on the ground that the release of the tax claims showed that the Campbells were looking after this property, and, as they were supposed to be rich men, it would be useless to spend effort in that direction. Later on, in May, while the respondent was absent in New Mexico, McElroy was induced, by the prospect of new railroad enterprises in the locality of these lots, to open up negotiations with one Downing, the local agent of the Campbell heirs, for their purchase. After some parleying he obtained a proposition of an offer at $30,000, $10,000 cash payment, and three years' time on the balance, at 6 per cent. interest, deferred payments to be secured by deed of trust on the property. McElroy, up to this time, was conducting this transaction on his own account, for the reason, as stated by him, that he did not know that Swope would consent to so large an adventure. The master finds that on the 15th day of May McElroy and Downing were to meet to execute the contract of purchase by appropriate writing, when Swope, learning thereof, met with McElroy, and insisted that the proposed speculation should come within the terms of their partnership agreement. This was acceded to by McElroy, the deal consummated by taking the title in the name of Swope, and that Swope should account for the one-half interest therein, and that one-half of the purchase money, with interest at 6 per cent., should be charged to McElroy. As this is the chief matter in controversy between these parties, the court has examined the evidence bearing upon this issue with care. The court confesses that, when the oral argument of this cause had before it ended, it entertained a strong impression that the imputed contract respecting this property was voidable under the statute

of frauds; but when it had concluded the long and tedious reading of the testimony it could not escape the conviction that Swope came into this title, with its expected profits, under conditions and circumstances which a sense of fair dealing and common honesty forbid that he should hold and enjoy to the exclusion of McElroy. No unprejudiced mind can read the testimony without reaching the conclusion that there was some compact, some common understanding, between these parties, not only when the contract of purchase was made, but for months thereafter, that McElroy had a joint interest in the property with Swope of some character, repeatedly recognized by Swope, and on the faith of which McElroy acted, and greatly to his injury, unless protected by the court. Indeed, so conspicuous is this fact, that Swope's counsel virtually concede that Swope did agree to admit McElroy to a one-half interest in the property, but it was a conditional sale, within the interdiction of the statute of frauds. If the facts, as found by the master, or as they may turn out on the review of the court, be that McElroy uncovered the speculation, and obtained for himself the proposition of sale, and induced Swope to take his place, on the understanding that Swope was to furnish the purchase money, take title in his name, and afterwards let McElroy have a half interest on his paying half of the purchase money, such a contract would be within the prohibition of the statute of frauds. *Dunphy* v. *Ryan*, 116 U. S. 491, 6 Sup. Ct. Rep. 486. It would be of the nature of a conditional sale. Where the title to real estate is taken in the name of one party, a resulting trust in favor of a third party, not named in the deed, may be shown by parol, where the proof is clear and undoubted, provided the purchase money, or a part thereof, was furnished by such third party. But the rule of equity is that such trust must have arisen at the time the purchase was made, and the money or consideration must have been paid, or secured to be paid, by such third party at or before the purchase. *McKinnon* v. *McKinnon*, 46 Fed. Rep. 713, (recently decided by this court at the St. Joseph division;) *Ducie* v. *Ford*, 138 U. S. 587, 11 Sup. Ct. Rep. 417. It is, however, the well-settled law that there may be a partnership between two or more parties to deal in lands. Equally well settled is it by the great weight of authority that the existence and terms of such partnership may be established by parol testimony. Bates, Partn. § 320; *Dale* v. *Hamilton*, 5 Hare, 369; *Chester* v. *Dickerson*, 54 N. Y. 1; *Richards* v. *Grinnell*, 63 Iowa, 44, 18 N. W. Rep. 668; *Bunnel* v. *Taintor*, 4 Conn. 568; *Holmes* v. *McCray*, 51 Ind. 358; *Clagett* v. *Kilbourne*, 1 Black, 346; *Hunter* v. *Whitehead*, 42 Mo. 524; *Snyder* v. *Wolford*, 33 Minn. 175, 22 N. W. Rep. 254; *Piatt* v. *Oliver*, 2 McLean, 267; *Smith* v. *Tarlton*, 2 Barb. Ch. 336; *Carr* v. *Leavitt*, 54 Mich. 540, 20 N. W. Rep. 576. Lindley on Partnership, p. 88, says—

"That a partnership constituted without writing is as valid as one constituted by writing, and that, if a partnership is proved to exist, then it may be shown by parol evidence that its property consists of land. The subject being an agreement for land, the question then is whether there was a resulting trust for that partnership by operation of law. The question of partnership

must be tried as a fact, and as if there was an issue upon it.   If by the facts and circumstances it is established as a fact that the parties were partners, in which land was necessary to carry on the trade, the lease goes as an incident. The partnership being established by evidence upon which a partnership may be formed, the premises necessary for the purpose of that partnership are, by operation of law, held for the purpose of that partnership."

The observation of the court in *Chester* **v.** *Dickerson, supra,* is quite pertinent:

"Suppose two persons, by a parol agreement, enter into a partnership to speculate in land, how do they come in conflict with the statute of frauds? No estate or interest in land has been granted, assigned, or declared.   When the agreement is made, no lands are owned by the firm, and neither party attempts to convey or assign any to the other.   The contract is a valid one, and, in pursuance of this agreement, they go on, and buy, improve, and sell lands.   While they are doing this, do they not act as partners, and bear a partnership relation to each other?   Within the meaning of the statute, in such case, neither conveys nor assigns any land to the other, and hence there is no conflict with the statute."

It can make no difference that the title to the land is taken in the name of one of the partners, or placed in that of a third person, (Bates, Partn. § 28;) nor that one of the partners may have furnished all the purchase money or capital,—if the business appears to be jointly conducted, with a communion of profits as such.   "The general rule is that the parties are treated as partners, unless the contrary is shown; that is, they will be supposed to obtain the benefit of partnership, and to share the chances together, where they have omitted to show a contrary intention."   Bates, Partn. § 35.   "An agreement that something shall be attempted with a view to gain, and that the gain shall be shared by the parties to the agreement, is the grand characteristic of every partnership, and is the leading feature of nearly every definition of the term." Lindl. Partn. § 1.   If the fact be that during the continuance of the partnership as heretofore found to exist one of the parties found what he conceived to be parcels of real estate desirable as a speculative investment, which he determined to take to himself, and, after the terms of the purchase were agreed upon, the other partner was admitted, as such partner, to take the contract and consummate the purchase by taking the title in his name for the joint account, and to share in the profits of the adventure, McElroy to give his note or notes to Swope for the one-half interest, to be secured by lien on his half interest in the land, the agreement would not be affected by the statute of frauds.   In such case it is a joint purchase, in the name of one party, where the other secures to be paid his share of the purchase price.   In such case he is entitled to his proportion of the property as a resulting trust.   *Wray* v. *Steele,* 2 Ves. & B. 388; *Honore* v. *Hutchings,* 8 Bush, 687; *Tenney* v. *Simpson,* 15 Pac. Rep. 187, 512, 37 Kan. 353, 579; *Simpson* v. *Tenney,* 21 Pac. Rep. 634, 41 Kan. 561; *Boyd* v. *McLean,* 1 Johns. Ch. 582.   Equity treats the transaction as a loan by the partner taking the grant to the other partner.   He takes the whole title in the nature of a mortgage to secure the loan.   The interest agreed to be paid is pledged for the repay-

ment of the purchase price advanced. As said by the court in *Honore* v. *Hutchings, supra:*

"Such an agreement is perfectly consistent with the idea of a mortgage, and, though we may doubt whether or not the absolute conveyance to Hutchings was intended to operate only as such, yet the rule is that in all doubtful cases the law will construe a contract to be a mortgage, because such a construction will be most apt to attain the ends of justice, and prevent fraud and oppression. *Skinner* v. *Miller,* 5 Litt. (Ky.) 86."

In Greenleaf's Cruise, note 1, p. 74, the distinction between a conditional sale and a mortgage is stated thus:

"Where the debt forming the consideration of the conveyance still subsists, or the money is advanced by way of loan, with a personal liability on the part of the borrower to repay it, and by the terms of the agreement the land is to be reconveyed on payment of the money, it will be regarded as a mortgage; but where the relation of debtor and creditor is extinguished, or never existed, there a similar agreement will be considered as merely a conditional sale."

It was doubtless in recognition of this rule of law that it was held in *Page* v. *Page,* 8 N. H. 197, that where A. pays the purchase price of the land, and takes the title in his name, yet, if it clearly appear that the money thus advanced was a loan to B., to be thus invested, there was a resulting trust in favor of B.

In order to ascertain what the exact agreement between Swope and McElroy was respecting the Campbell purchase, and their intention as to it, we must look to the four corners of the controlling facts and circumstances in evidence. Without exception, so far as we can discover, every piece of real estate acquired by McElroy in 1888, after the employment of the abstractor, was recognized in some way as joint property; and the finding of the master that they were partners therein is well sustained by the proofs. That McElroy negotiated for the Campbell lands, and obtained the option thereon, so far as Downing had authority to give it, is well established. Downing knew nothing of Swope in the transaction until he and McElroy met to close the contract by writing. McElroy testifies that he was ready and able to consummate the trade on his part, and there is no such proof or state of circumstances in the case as to justify a court in finding that McElroy was not willing and able to carry out the contract on his individual account. How, then, did Swope come so suddenly into the adventure? His own statement is that he only returned from New Mexico on the 14th day of May,—. the day before the contract of purchase was consummated. After Downing had advised McElroy that his proposition from the general agents at St. Louis was $30,000, one-third cash on the delivery of the deed, three years on the balance, with 6 per cent. interest, and McElroy had telephoned Downing his acceptance, Swope appeared upon the scene, and he and McElroy rode out in a buggy, and hastily looked at the lots. In the course of his deposition Swope states that he was not familiar with this property before the purchase. He did not even know the feet of frontage, nor the depth of the lots. It would present a remarkable and most unusual state of proceeding for Mr. Swope, with his caution, conservatism, and reserve, to believe that on such a cursory view, and on

such short warning, he would instantly close, on his sole account, a purchase of such magnitude, and that, too, when he had been absent from the state for months. The very circumstances surrounding the trade for this land irresistibly go to corroborate McElroy's contention that Swope accepted his judgment, and came into the adventure as a partner. McElroy's deposition is that Swope learned on his return to the city of the pending trade, and insisted that the "deal" should come within the partnership arrangement, Swope agreeing to furnish the purchase money; take deed of trust on McElroy's half interest for security; and, inasmuch as the deferred payments on the land were to bear 6 per cent. interest, Swope should not charge him greater interest, and that Swope so agreed. Swope does not deny that McElroy was to have an interest, but his contention is that it was merely conditional; that McElroy urged him to take the trade, and to thereafter let him (McElroy) have a half interest, by giving his note for one-half the purchase money, at 10 per cent. interest, secured by deed of trust on the property; and that even this was further conditioned on the assurance given by McElroy during the negotiation to the effect that he would procure a "syndicate," interested in a scheme to establish a union depot in that locality, to take two of the lots at the price of $30,000. Which statement is correct? Which is the more reasonable,—the best sustained by all the facts and circumstances in evidence? The master has found that the statement of McElroy is true. How do the facts sustain this finding?

Felix Fox, a lawyer, and relative of Mr. Swope, was called upon to draft the contract between Downing, agent, and the purchaser. McElroy testified that the original draft of the contract drawn by Fox contained the name of McElroy as the purchaser; but, on account of confusion in the description of the property, Fox tore up this paper, and they adjourned to a later hour of the day to straighten out this description, and to obtain a printed form for such contract. That when they came together again Swope was present, and entered a protest against the payment of $1,000, which had been agreed upon by McElroy and Downing as earnest money to bind the option. Swope stated that he regarded himself as good on his contracts; whereat Downing consented that, as he knew little of McElroy's financial responsibility, and did know, from reputation, Mr. Swope's responsibility, if the latter's name were substituted as the purchaser, he would waive the requirement for such cash payment. Accordingly Swope's name was so employed, and the contract was so executed. In this respect McElroy's statement is corroborated, in the main, by Downing. He does not so positively affirm the insertion of McElroy's name in the first draft of the contract, but gives it as his impression. Fox, while denying the writing of more than one copy of the contract, and the use of McElroy's name, testified that he did hear the conversation between Downing and McElroy respecting the $1,000 earnest or forfeit money, and Swope's protest against its payment; and he made this significant statement, that—

"I presumed from the conversation that McElroy was to take the contract in his name. Mr. Downing demanded a thousand dollars to be paid in cash.

McElroy then said that Swope was a rich man, and the contract could be taken in his name."

The whole subsequent history of this transaction shows that the parties for months treated this purchase as a joint matter, and that Swope repeatedly recognized this fact. When the abstract of title was furnished by the vendor it was discovered that there was an incumbrance on some of the lots in favor of the Missouri Pacific Railroad Company for right of way. The complainant was the active agent through whom it was sought to remove this trouble. He made repeated trips to Independence, the county-seat of Jackson county, to examine the court records and recorded deeds, and procured copies of certain records pertaining to the title of this property, and placed them on record at Kansas City. He held conferences with the local railroad attorney at Kansas City respecting this easement of the railroad. He made two trips to St. Louis,—one in connection with Mr. Swope,—and employed counsel, and conferred with the managing officers of the railroad company, with a view to the settlement of this cloud on the title. Failing in this, he was chiefly instrumental in effecting with the general agents of the vendors, at St. Louis, a modification of the contract of sale, whereby the purchase price of the lands was reduced from $30,000 to $24,000. It was then discovered that one of the Campbell heirs was supposed to be *non compos mentis*, and therefore incapable in law of making a valid transfer of his interest, which was one undivided twelfth part. Other persons,—W. H. Winants and William Taylor,—residing in Kansas City, had, shortly prior to the purchase by Swope, bought other lots from the Campbell heirs, and their title was subject to this same infirmity. A consultation of all the parties in interest was held, participated in by Winants and Taylor, Swope and McElroy, with their respective counsel, directly and indirectly. The result was that it was determined to send some one to Boston, where the Campbells resided, to see if this obstacle could not in some way be removed. It was at the special instance and request of Swope that this labor fell to McElroy, as one of the parties in interest, and the one most familiar with the whole matter. It was agreed that the expense of this trip should be borne ratably between the parties, with the exception of McElroy, whose time and services were to exempt him from the assessment. All the parties being present, including Swope, Winans and Taylor executed the following authority to McElroy:

"KANSAS CITY, MO., May 28, 1888.

"We, the undersigned, having purchased of the Robert Campbell estate certain real estate in the city of Kansas, hereby give full power to J. E. McElroy, who is also a purchaser, to act for us in the matter of perfecting the title to said real estate."

It is true, Swope did not sign this paper, but it is tantamount to a declaration made in his presence that McElroy "is also a purchaser," made while the matter of perfecting the title was in progress, acquiesced in by Swope. He gave no similar paper to McElroy, on the assumption, it is but fair to make, that as a man somewhat versed in the law he

recognized the legal position that in a partnership all are principals, and one is the agent of the other. McElroy made this trip, but failed of success. On McElroy's return home he was most active in devising ways and means for overcoming the obstacle to the acquisition of this one-twelfth interest. The letters (put in evidence) from the Kaime Bros., the general agents of the Campbells, respecting this transaction, were all addressed to McElroy. The result of the matter was that the contract of purchase was again modified by accepting from the other 11 heirs a deed for their interest, and the purchase price was proportionately lessened. After this, other means were considered for obtaining a valid title to the remaining one-twelfth interest. On consultation it was determined to institute partition suits in the Jackson county circuit court in the name of one of the heirs against all the parties in interest. This was to be, of course, an amicable proceeding. Accordingly, Mr. Brown, the attorney hired by the year by Swope and McElroy, prepared the suits; and in the one concerning the Swope title the other Campbell heirs, with Swope and McElroy, were made parties defendant, the latter two as purchasers under the contract aforesaid. Swope denies knowledge of the fact of making McElroy a defendant. On this issue the testimony of Brown, the attorney, is important enough to quote. He says:

"Mr. McElroy, Swope, and Downing were in consultation in Mr. McElroy's private room and Mr. Swope's room, off and on, making a trade in regard to this land; and Mr. McElroy and Swope ordered me to bring a partition suit for partition of the land. I believe they claimed an interest in some way, and some other parties had an interest, and they wanted a partition. I prepared the papers for suits, and had them all ready to file, and Mr. McElroy—I believe he was the one—told me not to file them now, as they had made other arrangements. They directed me to bring suit for Hazlett K. Campbell against Thomas H. Swope, James E. McElroy, Hugh Campbell, Jr., James A. Campbell, and J. F. Downing, defendants. It was a friendly suit, and they deemed it necessary to bring this suit in order to get their interest,—I mean McElroy and Swope's interest; and Downing was authorized to represent the Campbells,—was a trustee, I believe, in a mortgage on land,—and he and McElroy and Swope all agreed and assented to this manner of procedure, and directed me to bring the suit."

The whole matter was ultimately consummated by Swope accepting the deeds from all the heirs, including the supposed demented one, for the lands. These deeds were forwarded by the Kaimes, Campbells' agents, to McElroy, and were placed on record, and the fees therefor advanced, by McElroy. After the purchase of this property Swope rode around in a buggy with McElroy, and they notified the tenants found on any of the lots that they had purchased this property, or that they owned it, and demanded of them that they attorn to them. Some of these tenants testify that Swope said he and McElroy were partners in the property. One of the lots was occupied by a firm for a brick-yard; and, as such a lease was important, as the use touched the freehold, Swope and McElroy made a written lease to these tenants for a term. Both signed the lease as landlords. The rental was collected by or through McElroy, and the same was equally divided between them. At the ex-

piration of this lease it was renewed, by written indorsement thereon. This was signed by McElroy for himself, and by Swope, per McElroy, agent. McElroy's authority to do this last act is denied by Swope, while McElroy asserts his right as partner to so sign. Be this as it may, the truth is that Swope continued to receive his half on the rents until after this suit was brought. McElroy also collected rents from other tenants, and the same was entered to the credit of Swope and McElroy. One of the persons occupying one of the lots, named Miller, was unwilling to attorn, unless some previous claimed right of his was recognized. He testified that when he went to Mr. Swope's office, and tendered him the money on condition of his signing a proposed receipt, Swope said "he had a partner in that property" he had to see about it; and took the receipt and disappeared for a few moments, and, returning, declined to execute it. As this room was adjoining McElroy's, the fair presumption is that he went in there to consult with McElroy. Swope afterwards collected rent from this tenant. In July, 1888, while spending a Sunday at the home of complainant's father, Swope stated that during his absence in New Mexico James E. McElroy had made a purchase of the Campbell lands, and that he had agreed to carry the deal for three years at 6 per cent. interest, and that he was satisfied they would make fully $100,000 out of the purchase, and that he was satisfied the business in which he and McElroy were engaged would bring a profit of $250,000, and spoke of one of the "partners" going to Boston to see about the title. And again, when on a trip with the elder McElroy to Vernon county, he spoke of the Campbell lands, and about how much "they" (evidently meaning himself and complainant) would make on this speculation. It is true, these witnesses are relatives of the complainant, and their testimony is to be scrutinized on that account; but I fail to find anything in the depositions or testimony to justify the court in discrediting them, especially when not directly contradicted by the respondent in his deposition. Later on, in the fall of 1888, the evidence shows that, in order to settle definitely a supposed or real embarrassment as to the boundary line between one of the lots in this Campbell purchase, it became important to secure deeds of release from T. S. Case *et al.* The accomplishment of this act, in the completion of the title to the Campbell lands, likewise devolved on the complainant.

While, perhaps, with more logical fitness it might have been adverted to under another head, yet among the more conspicuous facts to show that Swope regarded the business in which he and McElroy were engaged as possessing the qualities of a copartnership, with its incidental liabilities, shortly after his return from New Mexico, and while the Campbell purchase was incompleted by deed, he suggested to McElroy the policy of transforming their association into a business corporation under the statute. To this end a copy of like articles of incorporation were obtained by them at the recorder's office, the object being to avoid the individual liability which the law attaches to a partnership. But when Swope was advised that under the Missouri statute 50 per cent. of the stock subscribed had to be actually paid up before the certificate of

incorporation would be issued, he abandoned the project. But the joint operations of the parties, as hitherto conducted, abated nothing in vigor. It was after this that the law firm of Peak, Yeager & Ball were employed by Swope and McElroy for the term of one year, at a salary of $1,000; that another abstractor was hired for six months at $200 per month, to be paid for by Swope. Chains of titles were extended to large and valuable tracts of land, looking, *inter alia*, to a large advent- ure in a body of land on the Missouri river front. No single transac- tion so fitly illustrates, as this last named, how eagerly the respondent sought to share the profits of the speculative schemes the fertile mind of the complainant inaugurated, by putting McElroy to the front to do the actual work and bear any public odium which might attach to it. The lands lying on this river front had once belonged to a corporation in which the respondent was a stockholder, and perhaps a director. This company had, with the co-operation of the respondent, sold this land, and conveyed by deed of warranty. A man named Turner had also conceived the idea that, if the submerged lands lying contiguous could be reclaimed, it would open up an immense speculation to the promoters of the scheme. As McElroy was working at the same thing, he and Turner "pooled" their plats, maps, and notes, and entered into a written compact to work up a joint syndicate to accomplish this enter- prise. That Swope came into it on the basis of a partner with McElroy, the evidence is quite satisfactory to my mind. But he insisted that in the contract between McElroy and Turner his name should not appear, for the reason that, his company having conveyed the contiguous land, a question might arise as to its liability on its covenant of title, and as one of the stockholders a question might arise as to his liability; be- sides, it would be embarrassing in such a controversy for his former as- sociates to know that he was a party to this scheme. Accordingly his name was omitted, and he got rid of his stock by a simulated transfer of it to a colored man, named James. The chain of title to this prop- erty was made by the abstractor employed as aforesaid. This scheme, however, brought no results. As further confession by Swope of his conscious association with McElroy as partner in all these adventurous speculations, an article appeared in the Kansas City Star, an evening daily newspaper, directing attention to the plans and operations of a firm endangering titles to a large quantity of property in and about the city, and greatly disturbing the city's prosperity. No names were given; yet the respondent was greatly annoyed over it, and said he knew it referred to him and McElroy, and charged that the facts were given away by his relative, Mr. Fox, and furnished to the paper by one Slavens, with whom he and McElroy had had some trouble over one of their titles. In September, 1888, it is evident the personal relations between these parties were becoming strained. McElroy's faith in the good intentions of the respondent was not so strong as hitherto. He then presented, or caused to be presented, to him a contract, to be signed by him, (Swope,) providing for the conveyance of the undivided half interest in the Campbell lots. The complainant testifies, without direct contradic-

tion from respondent, that respondent said that he would defer the matter until he obtained the entire twelve-twelfths interest,—he then having deed to only the eleven-twelfths. This paper respondent retained, without signing, until this trial. For what purpose did he keep it? Did he do so with the expectation that he would yet sign it? Or had he then formed the secret resolution to repudiate his understanding with complainant? About that time the complainant made out quitclaim deeds to respondent to certain lands in his (McElroy's) name, as did also Brown to lands held in his name, (the latter being made to McElroy before McElroy executed his quitclaims.) These deeds complainant showed to respondent, stating that it was for his half interest in the lands held in partnership,—at least according to complainant's version, —and asked respondent to do likewise as to the Campbell lands. These deeds Swope kept, and had put to record, without reciprocating as to the Campbell lands. Thus matters stood respecting the Campbell lands until March, 1889, when the master finds that Swope caused to be left for McElroy a quitclaim deed for an undivided half interest in this land, accompanied by a deed of trust to be executed back for the purchase money, $12,000, at three years, with 6 per cent. interest from the 15th day of May, 1888. Accompanying this was also a contract, to be signed by McElroy, containing stipulations respecting the application of the proceeds of the sale of certain of the lots hitherto sold to one Evans. The deed thus accompanying these papers was not, however, signed by Swope.

The witness Painter—the same employed as abstractor for six months to be paid by Swope—is relied upon by respondent to create the impression that McElroy instigated him to the drawing up of these papers, and that Swope had nothing to do with their origin. I concur with the master in attaching little credit to the testimony of this witness. He is too superserviceable to the interest of the man whose hand gave him $200 per month. His conduct on the witness stand, his activity while off of it in looking up testimony for Swope, his manifest partisanship, little recommend him to the favorable consideration of the judicial mind. In his examination in chief he sedulously sought to create the impression that McElroy directed him to frame these papers; or, rather, that he did so in his interests, and that Swope had nothing to do with it. But, unfortunately for his purpose, the original draft of the contract, in the handwriting of Painter, was, evidently through inadvertence, folded in the type-written copy of the contract, and thus fell into the hands of McElroy. This draft shows alterations and amendments in the handwriting of Swope. The witness, with evident reluctance and argumentative evasion, on cross-examination had to admit that Swope saw the paper before it was submitted to McElroy. The statement of McElroy is corroborated that he refused to execute these papers on his part, principally for the reason that the contract and deed of trust did not correctly and fairly express the understanding as to the interest. They stipulated for interest on the $12,000 note from the 15th day of May, 1888, the date of the contract with Downing for the pur-

chase of the land, instead of the date of the deed, some months later, at which last date Swope made his first payment, and from which time his own notes bore interest. The equity of this objection is palpable. The other objection made by McElroy was that it provided for only one note and trust-deed from him, covering the whole land, instead of being so drawn in blocks of lots as to enable him to have a release thereof in case of a sale of a particular lot, which he claims was his understanding with the Kaimes, the general agents, as to the contract of purchase. These papers evince, up to that date, a recognition by Swope of some sort of obligation on his part to let McElroy have a half interest in this property, provided he could discharge it on his own terms. In all the other purchases made by McElroy, where the purchase money came from Swope, no deeds of trust nor notes seem to have passed, although Swope seems to have so far concurred in the terms of "the joint arrangement" as to the tax-titles to say that he was thus to be secured as to the money to be advanced by him. In this connection it is worthy of notice that no one transaction between these parties so fitly illustrates this fact, while utterly contradicting Swope's pretension that the "joint arrangement" was limited to dealings in lands affected with tax-titles to be bought on his own judgment, as the history of the Euncau lands, consisting of 2 2-10 acres. McElroy conducted this trade, and brought the property to Swope's attention, while he was absent in New Mexico. On April 9, 1888, Swope wrote McElroy from Kingston, N. M., as follows:

"*J. E. McElroy*—DEAR SIR: I have just received yours of April 5th in reference to buying of Euncau of his two and two-tenths acres on our joint account for $700 or less. You can do about it as you choose; but if you buy, take deed of it in your name, and it must be a warranty deed against everything but tax-deeds and taxes, as Siavens may have an unrecorded deed from Euneau. If you buy, you can see Logan Swope, my brother, and get the necessary money on my account, giving me your note for one-half of it, with ten per cent. interest, payable on or before such time as you see fit to make it, inside of two years. Also make declaration of trust, showing that you hold one-half of it for me."

The complainant did make this purchase. It was a valuable purchase. They were offered $2,500 a year as ground-rent for it for a period of 10 years, the lessee to pay taxes. No declaration of trust was made by McElroy, and no note was given, nor did he pay 10 per cent. interest thereon. But at the settlement had, hereinafter mentioned, in December, 1888, McElroy was charged 8 per cent. interest thereon. McElroy made to Swope a quitclaim deed in July, 1888, for the one-half interest in this property. While Swope claims that he had, from time to time, advanced on the joint account the sum, perhaps, of $5,500, no accounting as to the same was had until December, 1888. The parties had evidently quarreled as to the manner of conducting the business respecting expenses incurred and charged for by McElroy. To obviate this in their future dealings the following agreement was then executed in writing:

"It is hereby agreed that all expenses hereafter to be incurred in our joint business shall be by mutual consent of both parties, and shall be borne equally between us, except J. A. Painter's salary, which Mr. Swope here agrees to pay; and it is agreed that accounts shall be rendered and settlements made every thirty days hereafter, each party paying his half at such time."

This is an admission in writing that a joint business then existed between these parties. It was not to be created. They merely provided a limitation as to the power of creating expenses, and as to the payment of the abstractor, and the time of making settlements. It also shows that their interests were respectively one-half.

I have thus gone at great length of detail over many of the more salient facts and history of the joint operations of these parties to disclose the real relation between them, and to fix the most probable and true character of the agreement respecting the Campbell lands. The question naturally enough arises as to why McElroy would consent, according to the theory of respondent's counsel, to give up what both parties at the time regarded as a most desirable speculation, take it from without the terms of their understanding and course of dealing as to other land transactions, or, if you please, the terms of the tax-title, "joint arrangement," and put himself completely at the mercy of Swope by consenting to a merely conditional sale. Do not all the controlling circumstances and acts of the parties persuade one to the conclusion that the parties regarded and treated this property as partnership property? The counsel for respondent, by inviting the court to regard this transaction as a mere conditional sale, ask the court to give Swope the benefit of this transaction, to the entire exclusion of McElroy; for they supplement their position with the argument that there has been no such part performance as to take the contract out of the operation of the statute of frauds. They argue that McElroy is not, under that theory, entitled to a specific performance. A court of equity, in such conjuncture, should rather refer the transaction to that rule of equity which, under the proofs, would secure to the party sought to be wronged his just rights, compelling the other to submit to what good conscience dictates. The moment Swope consented to advance the purchase money, and take McElroy's note, with deed of trust, for the one-half interest, pursuant to the partnership compact, it was a loan by the one partner to the other, and he took the title as security. That moment McElroy, by consenting thus to let Swope take his contract with Downing, the agent, became indebted to Swope for one-half of the purchase money. The relation of debtor and creditor was then established; and, of consequence, the transaction was not a conditional sale. There is no virtue in the suggestion that McElroy has not executed his note for the one-half interest. It might be a sufficient answer to this to say that Swope has never made deed to the one-half interest. Nor has he offered to do so, except in a manner which leaves him in a position to contest the fact, and then only on terms of his own choosing, attempting to collect interest long before he parted with the money which was the consideration. In *Honore* v.

*Hutchings, supra,* the court, speaking to a similar argument of counsel, said:

"We do not regard it as material that Honore was insolvent, and that Hutchings took no other security for his money than the land itself. In the case of *Edrington* v. *Harper,* 3 J. J. Marsh. 360, it was expressly agreed that it should be optional with the mortgagors whether they would repay the money advanced or not; and yet the court held, this being virtually the fact in every mortgage as to whether the condition should be forfeited or not, it could not have the effect of converting what would otherwise have been a mortgage into a conditional sale."

The ultimate resort of counsel for respondent that Swope was induced to make the purchase of the Campbell lots on the assurance of McElroy that he would have a "depot syndicate," for which he was agent, buy two of the lots at $30,000, is by no means satisfactorily established. The external probabilities confirm complainant's denial of any such agreement. As this is in the nature of new matter and affirmative defense by the respondent, he is hardly entitled even to the benefit of the rule that his sworn answer must be overcome by additional testimony or strong circumstances corroborating the complainant. The position of respondent is not plausible; nor is he, in this contention, consistent with himself. In the course of his testimony he stated that he regarded the Campbell lands as a poor investment; and to another witness he expressed the opinion that he thought or feared McElroy was paying too much for the property; and in another place he stated in his deposition that the two depot lots were the most valuable of the lots. Why would McElroy, after he had agreed with Downing upon the purchase for himself at $30,000 for 22 lots, consent to let Swope take the contract, when he could obtain for himself, by this sale to the syndicate, sufficient for 2 lots to pay for the whole? And would it not have been an absurd transaction for him to give such an assurance, while agreeing, according to Swope's theory, to give Swope his note for one-half of the remaining lots at the original contract price for the whole? Had he made any such suggestion to Swope, it would do violence to Swope's admitted good business sense to hold that he placed any reliance thereon. It is quite probable that on account of the prospective completion of important railroad enterprises in that locality this property was regarded by both parties as a valuable investment for terminal, depot, and switch facilities; and it is also most probable that the parties discussed the possibility and feasibility of such sale. But to treat such fancy as the basis of the condition on which McElroy was to have the right of a partner in the speculation is not to be entertained. When was such sale to the depot syndicate to be consummated? What limit as to the time was expressed or implied? If such sale was the condition precedent to McElroy's admission to the adventure, why is it that it was never insisted on by Swope at any of the occasions when the question of making a deed to McElroy for the one-half interest was broached? Why is it that at no time did he assign this as a reason for not closing the matter? In February, 1889, confirmatory of Swope's recognition up to that date of Mc-

Elroy's interest in this property, through the joint co-operation of Swope and McElroy an option contract was closed with one Evans for the sale of two of the lots for the use of such depot scheme. Both McElroy and Swope made alterations and suggestions in the written contract respecting this sale; and when it was executed by Evans it was delivered to McElroy, as a real party in interest. Evans failed to make the required payments, and no title passed to him. One of the provisions of this option contract, evidently exacted in the interest of the vendor, that the property thus sold was not to be sold by Evans "to any person or persons for any purpose inconsistent with the erection of the depot," shows that Swope was contracting independently of the terms of the alleged conditional sale to McElroy of the one-half interest, and that a part of the consideration of the sale to Evans was the supposed advantage to accrue to the residue of the lots held by Swope from the use of the two lots for depot purposes. It results that the finding of the master that the Campbell lots should be regarded as partnership property is sustained.

*The Willoughby Thomas Gray Lot.* There is much evidence and debate between counsel respecting lot 3, block C, Ashburn's addition, claimed to come within the terms of the partnership. As respondent virtually admits that complainant is entitled to the one-half interest in this lot, but that he owes him the sum of $250 thereon, and the complainant concedes this claim, it is not essential to discuss it further.

Other matters are discussed by counsel, and reported on by the master, which are not deemed of sufficient importance to justify the further prolongation of this opinion. Criticism is made that the master finds there are certain lots or parcels of land held in the name of Brown, in trust for the partnership, which the master does not dispose of, nor report the value of, and hence leaves part of the partnership assets unsettled. This is purely technical. It has no tangible value. These lots are the property taken in the name of said Brown from one Welland, to secure a loan of $100 made him by McElroy, which has long since been repaid, and for the further purpose of prosecuting, on the share, a suit in the name of said Brown to test the validity of certain tax-sales adverse to the ownership of said Welland. While the fact does not appear in this record, yet the court may take cognizance of its own records. The validity of this said tax-sale title has been recently litigated in this court in an action between the assignee of said Welland and the purchasers at the tax-sale, in which the validity of the tax-title was affirmed. See *Bird* v. *McClelland*, 45 Fed. Rep. 458. Aside from this, the respondent, in his testimony, states and concedes that the claim of himself and McElroy to these lots is of no value. They have no title. Brown, who holds the legal title, testified that he was willing and ready at any time, on the request of Swope and McElroy, to quitclaim to them. As he holds in trust for both parties, he could not relinquish except on their joint request; and, as he is not a party to this suit, the court could not decree title out of him, and place the same in these parties. To this contention, therefore, the maxim might most fittingly be applied, *rixatur delana a caprina.*

The evidence shows that in February, 1889, Swope sold portions of

the Campbell lots to one Anderson for the price of $36,125, part of which was paid at the making of the deed, and one and two years were given for the payment of the balance. Payments have since been made thereon by the purchaser. The master, in his accounting between the parties, has charged Swope with this $36,125 as if received by him. To this Swope excepts, on the ground that he has not received all of this money, and may never collect the same; that, while it is secured to be paid by a deed of trust on the lots sold, the security may prove insufficient. The grounds of the master's charging Swope with the amount of this sale are stated by him to be that the evidence shows the security to be amply good, and more especially on the legal assumption that Swope, by denying the interest of McElroy and withholding the notes of Anderson for the purchase money, has converted the same to his own use, and should be charged with the apparent value. This is plausible; but where the whole matter is brought into equity for settlement, where that is to be regarded as done which should have been done, the court should make such adjustment as will most nearly reach perfect equality between these parties. Of course, if Swope had sold these notes, and parted with his control over them, he should be charged with them. If he yet retains them, and they are unpaid, and he will bring them into court within 10 days after the filing of this opinion, and submit them to the order of the court for equitable adjustment between him and McElroy, the accounting will be reformed accordingly. The further ruling and decree of the court will be made upon the action of the respondent respecting the suggestion of the court touching said Campbell notes.