[No. 1828]

CHARLES H. BOTSFORD, APPELLANT, *v.* L. C. VAN RIPER, JOSEPH HUTCHINSON, JAMES DAVIS, J. P. LOFTUS AND JAMES DAVIS, DOING BUSINESS UNDER THE FIRM NAME OF LOFTUS & DAVIS; GOLDFIELD MOHAWK MINING COMPANY, GOLDFIELD CONSOLIDATED MINES COMPANY, COMBINATION MINES COMPANY, GEORGE S. NIXON, AND GEORGE WINGFIELD, RESPONDENTS.

1. APPEAL AND ERROR—REVIEW—CONCLUSIVENESS OF FINDINGS.
    The supreme court will not disturb findings on conflicting evidence.

2. JOINT ADVENTURES—RIGHT TO RECOVER INTEREST.
    That plaintiffs and defendant agreed to use their joint efforts to secure an option on certain property and to sell the same, defendant to be the active agent of the venture, that plaintiffs assisted in furthering the venture by counsel, introductions, and personal efforts, that it was agreed that the parties should share equally in the profits, that the venture was successful and defendant was to receive stock of a specified value as compensation, that he was attempting to get possession of all the stock and refused to recognize plaintiffs' rights to any interest in the proceeds of the venture, and that he was outside the state and insolvent, shows plaintiffs' right to recover equal interests in the proceeds under the doctrine of joint adventure.

3. JOINT ADVENTURES—CONSIDERATION OF—SUFFIENCY.
    Plaintiffs' suggestion to defendant of a scheme for merging properties and advice and counsel to him, and the mutual promise of assistance in promoting the venture, were sufficient consideration to sustain an agreement for an equal division of the profits of the venture, though defendant agreed to do all the other work.

4. JOINT ADVENTURES—TRUSTEESHIP.
    Where property or profits are acquired under a joint adventure, a party holding title to the same is a trustee for his associates as to their proportionate shares.

Points decided

5. JOINT ADVENTURES—RELATION BETWEEN PARTIES.

The relation between the parties to a joint adventure is fiduciary, and the utmost good faith is required of the trustee to whom matters may be intrusted; he not being entitled to any advantage over his associate on account of possession of property or profits.

6. JOINT ADVENTURES—RIGHTS OF PARTIES.

Associates of the trustee of a joint adventure can recover from him for any breach of his trust.

7. JOINT ADVENTURES—CONSIDERATION—SUFFICIENCY.

The furnishing of capital by the parties to a joint adventure is not essential to the validity of the contract if the original agreement is carried out.

8. JOINT ADVENTURES—RIGHTS OF PARTIES.

That the active agent of a joint adventure did not call upon his associates for the aid they agreed to give does not affect their right to share in the profits.

9. JOINT ADVENTURES—ADVANCES BY PARTY—EFFECT.

Advances by one party to a joint adventure are loans to the venture for which he is entitled to reimbursement from the proceeds of the venture, but they give him no other superior rights against his associates.

10. JOINT ADVENTURES—DIVISION OF PROFITS.

In the absence of an express agreement to the contrary, equal division of the profits of a joint adventure is implied, regardless of inequality of contribution.

11. JOINT ADVENTURES—ACCOUNTING—RIGHTS OF PARTIES.

A party to a joint adventure holding the profits may be compelled to account to his associates for their share of the property representing such profits in kind.

12. JOINT ADVENTURES—PROFITS—FORM.

The profits of a joint adventure may consist of the unsold portion of the property which was the subject of the venture, or property received as compensation for services rendered in connection with the venture, as well as money.

13. JOINT ADVENTURES—RIGHTS OF PARTIES—REMEDIES.

While a party to a joint adventure may sue his associate at law for breach of the contract or a share of the profits or losses, or contribution for advances in excess of his share, such remedies do not preclude a suit in equity for an accounting.

14. ACTION—LEGAL AND EQUITABLE RELIEF.

Under the code of civil procedure, the district courts in proper cases may administer both legal and equitable relief.

15. JOINT ADVENTURES—SET-OFF.

One party to a joint adventure may set off against the demand of another advances or payments in behalf of claimant, and hence, in an action to recover an interest in the proceeds of a venture, expenditures by defendant were properly deducted from recovery awarded against him.

16. JOINT ADVENTURES—NATURE OF CONTROLLING PRINCIPLES.
      The legal principles governing partnerships apply generally
   to joint adventures.

APPEAL from the District Court of the First Judicial
District of the State of Nevada, Esmeralda County;
*J. P. O'Brien,* Judge, presiding.

Action by L. C. Van Riper and another against
Charles H. Botsford and others. From a judgment for
plaintiffs and from an order refusing a new trial,
defendant Botsford appeals. **Affirmed.**

The facts sufficiently appear in the opinion.

*Rufus C. Thayer, C. L. Harwood, James F. Peck, Solinsky
& Wehe,* and *Paul C. Morf,* for Appellant:

*First*—There was no joint ownership, nor a commu-
nity of property, between the plaintiffs and the defendant
Botsford in either the option, or in the proceeds from the
sale of the option.

The respondents in their brief merely assert that plain-
tiffs and defendant Botsford were joint owners of the
stock. They give no reasons for this assertion, except
that the trial court found the alleged contract as stated
in the complaint. They admit that plaintiffs contributed
no money to the venture. They claim that defendant
Botsford excluded the plaintiffs from all participation,
and withheld all information from them. But they do
not claim, and do not show, that the plaintiffs were ready,
able or willing to join in the purchase of the option, and
to make a new contract to meet the unexpected condi-
tions. All they do claim is this: "In the early stages of
the negotiations, when it became manifest that consider-
able sums would be necessary to promote the venture,
the matter of its provision was 'discussed,' and the
plaintiffs 'recommended' that 'the defendant see' Mr.
Davis in that regard." This is but a sample of the turgid
phraseology found everywhere in respondents' brief.
The plaintiff Van Riper puts it in a more prosaic light.
His language on the witness stand was as follows: "Mr.

Botsford said: It is going to take some money to secure this option; and Mr. Hutchinson said: 'Well, you can get somebody here who has money.'" And the plaintiff Hutchinson expresses the situation even more tersely. He testified: "Of course, he knew that I was unable after my first failure to raise money, and that I was not in a position financially to raise money, and I suggested that if he secured the option he was working for—it was a suggestion or idea—to present it to Loftus and Davis, and possibly raise money locally."

That shows that the plaintiffs could not be of the least assistance financially. In fact, counsel admit that the plaintiffs had no means. Perhaps that explains why they were "kept in the dark." They could not come in on the deal. But the appellant provided and furnished fifty thousand dollars. Twenty-five thousand dollars of that amount was paid to Mr. Moore and has already been discussed. The other twenty-five thousand dollars was paid on account of installments on the option. This amount did not come from Mr. Haskell in the first instance, and was not procured from him on the promise of delivery to him therefor of five thousand shares of the stock, as stated by counsel for respondents. The appellant and Mr. Davis had given their joint note in part payment for one of the options in the sum of twenty-two thousand five hundred dollars, and when the note fell due Mr. Davis took it up and charged the appellant with one-half of that amount. About the same time the appellant obtained a loan of fifteen thousand dollars from Senator Nixon through his bank, to enable him to make another installment payment then becoming due on one of the options. It was then that the appellant telegraphed to Mr. Haskell at New York and from him received the sum of twenty-five thousand dollars, which he used in repaying the loan from the Nixon and Wingfield bank and the amount he owed to Mr. Davis on account of the note taken up by the latter as above stated. Thus Mr. Haskell sent to the appellant twenty-five thousand dollars, with which the appellant paid his personal obligations

and liabilities incurred by him in the purchase of the options. Afterwards the appellant repaid and compensated Mr. Haskell for this money by transferring to him five thousand shares of the stock. But there is no evidence showing what promises or inducements, if any, the appellant held out to Mr. Haskell, or upon what terms he obtained this money from him, otherwise than as a personal loan.

Now, the findings of fact of the trial court find substantially the facts as here stated, without, however, going into the details. True, the court finds that "the plaintiffs and defendant Botsford" secured the option. And the trial court finds that parties other than the plaintiffs advanced moneys to enable "the plaintiffs and the defendant Botsford" to make the initial payments on said options. And the court also finds that the plaintiffs furnished the defendant with "such information and money," etc., "as were required of them."

But these findings cannot be taken literally. There is no pretense that the respondents contributed any money to the venture. It is admitted by respondents in their brief that they contributed none. The complaint does not allege the "purchase" of an option, and does not allege that respondents joined in or contributed to the purchase of the option. And in their brief the respondents complain in this court that "they did all they were permitted to do," but that "as soon as the probable success of the venture became apparent, the defendant Botsford withdrew himself more and more from the plaintiffs and refrained from affording them any information as to the progress of the negotiations." And counsel also state: "The plaintiffs were without knowledge of, or participation in, the transaction." The respondents also plead entire ignorance, at the time of bringing suit, of the fact that the option was purchased and cost money, and their counsel state: "If the plaintiffs failed to take these items of proper charge against the venture (meaning the money expended in the purchase of the option) into consideration in the allegations

of their complaint, it was as above stated due to the fact that the defendant had kept them entirely in the dark as to those matters, as well as all other matters respecting the negotiations for the purchase and sale of the option."

Clearly, upon the admitted facts, the findings in the particulars referred to must be deemed findings of conclusions. The court evidently concluded that if the option was secured by the defendant Botsford pursuant to the terms of the parol agreement, that in legal effect the option was secured by him and the plaintiffs. Evidently, the court treated all the money employed in the acquisition of the option as money advanced to the appellant and by the appellant for the use and benefit of the joint venture. But that is a question of law under the evidence and facts of the case, there being no express contract to that effect and no evidence that the appellant voluntarily intended it as such an advance. The question would depend upon the proper construction and legal effect to be given to the alleged parol contract and to the facts and circumstances surrounding the subsequent transactions.

The specific facts found by the court are entirely in harmony with this contention. The court finds as one of the terms of the parol agreement that "the defendant Botsford should have the exclusive charge and control of all the negotiations," and further finds that "the plaintiffs agreed to render services only as required and under the direction of the defendant Botsford." The court also finds that the defendant Botsford did carry on all of the negotiations in his name exclusively. Also, respondents admit "that from the first defendant Botsford insisted that all active negotiations should be conducted solely by himself." Hence, the finding that parties other than the plaintiffs "advanced moneys to enable the plaintiffs and defendant to make the initial payments," is not equivalent to a finding that said parties advanced said moneys to the plaintiffs and the defendant Botsford. There is no express finding saying so in direct terms.

The finding is pregnant with the admission that the appellant obtained the money and that the other parties advanced it to him; and in view of the other findings leaving the appellant in the exclusive charge of the negotiations, and conducting them solely in his own name, that must be the construction to be placed upon the language employed in the finding. The money having been advanced by the third parties to appellant, he could in turn advance it to the joint venture. But whether he did or did not involves in this case a conclusion and not a finding of actual fact. The language that the plaintiffs "furnished such information, money, etc., as were required of them," likewise is a conclusion; or, to be more exact, it is evasion and a subterfuge, and not a finding of fact at all. No money was "required" of them by the contract; and the contract contemplated that none of the parties to it should furnish or provide any money or capital. The law did not impose an implied obligation upon them to do so (see authorities cited below). It is admitted that appellant did not "require" any money of them; and they had none and could not have furnished, raised, borrowed or otherwise procured any, according to their own testimony. And the court nowhere finds specifically, or affirmatively and in direct language, any sum or amount of money to have been furnished by the plaintiffs. Therefore, coupled with the fact that neither by the contract, nor by law, nor by express request, the plaintiffs were required to furnish any money, the finding means that they furnished no money, because not required to do so. Thus construed, the finding is in harmony with the other findings, the pleadings, the evidence, the admissions of counsel, and the truth; if not so construed it would be in conflict with all of them.

The trial court finds that the defendant Botsford did not expend any money "of his own" in securing the option. The court had already found that he had so expended the sum of twenty-five thousand dollars in cash (finding 13). And in the 17th finding the court finds

that the plaintiffs should reimburse him in cash for this expenditure, *pro rata*. Hence, the 14th finding clearly means that outside of the money mentioned in the 13th finding the defendant Botsford expended no money of his own, but that the necessary money was advanced to him by third parties, and that he repaid the advances mentioned in the 14th finding out of the stock received. A mere reading of findings 13, 14 and 17 together will prove this contention.

But even then the finding is a conclusion upon its face in regard to the words "no money of his own." It admits, inferentially, that the defendant Botsford did expend money. Now, construing the finding strictly upon the facts stated within the four corners of the findings of fact, and without looking for information elsewhere as to who the parties were who advanced the money, or as to the terms and conditions upon which the advances were made—all of which the court below failed to find— we have a finding that money was advanced to appellant by third parties, that he expended this money in securing the option, and that he repaid the advances out of the stock received. The court found nowhere who were these parties, and did not find that the advances were made for an interest in the venture or in the profits. Nor did the court find that the advances were not made upon the credit and personal responsibility of the appellant. The mere fact that they were repaid out of stock and by the delivery of stock does not even raise the presumption of an agreement to pay in stock. The court did not find the amount of the advances, and it is impossible from the findings to determine whether or not the value of the stock given in payment was in excess of the amount of the advances, with interest. A bonus might have been paid, and the parties might have preferred to take stock, instead of money. But the court did find that the moneys were "advanced," and that the parties were "repaid for money advanced." These terms, in their ordinary significance, import a loan with a promise to repay, and imply a lender and a borrower, and the rela-

tion of debtor and creditor. There is no express finding, and there is no presumption from the facts as found, that the parties, who advanced money to be repaid, advanced it to be repaid only in case of success, and that in the event of failure they would assume the loss. The defendant Botsford, under the alleged parol agreement, had exclusive charge and control of all negotiations, and the plaintiffs agreed to render services only, and as required by him and under his direction. The negotiations were carried on by the defendant Botsford in his own name, exclusively, and the option was taken in his name. Clearly, therefore, the findings of fact show that the defendant Botsford employed moneys secured upon his personal credit and obligation in securing the option. What are moneys of his own? Surely, it can make no difference, so far as the results in this case are concerned, whether the appellant used his own personal money, or money obtained by him upon his credit and personal responsibility.

But we do not mean to keep this court from looking to the evidence to ascertain the real facts.

It has been already pointed out that the finding under discussion, the 14th finding, excludes the money paid by appellant in cash to Mr. Moore. Therefore it is referable only to the Davis and Haskell money, also already discussed. The parol agreement did not require the appellant to furnish, provide or procure any money. The court does not find that through the appellant's mere efforts, or through the joint efforts of plaintiffs and appellant, these two parties were brought into the venture and became associates of the original three. The parol agreement did not provide for, nor contemplate the bringing in of capital, or associates with capital, on any basis. And Mr. Davis or Mr. Haskell did not come into the venture on the basis that Botsford should give his time and skill, and they provide the capital with which to operate, for a share of the profits. Mr. Davis came in on the basis that the defendant provide a part cf the money required, and that himself provide the

other part.  The defendant then already had something inchoate which he could and did assign to Mr. Davis, and that something the defendant had acquired by personally promising to pay money for it.  It makes no difference that when it came to making the actual payments ·the defendant gave his promissory note in part, and in part secured a loan or advance from Nixon & Wingfield's bank, and that Mr. Davis paid for his own part.  It was the condition of the assignment of a one-half interest in the options to Mr. Davis, that he should pay fifty thousand dollars on account of the initial payments, and that the defendant should pay the remainder of the amount due and to become due on the initial payments.  The obligation to pay for the entire, undivided option went to the consideration for agreeing to pay for a part of its cost on the part of Mr. Davis.  The option was upon a controlling interest in the corporation, and without all the stock covered by it, control could not have been had, the merger could not have been effected, and the .venture would have failed.  Thus as to Mr. Davis, at least, the transaction, and the consideration for coming into it, was entire and indivisible, and conditioned upon the appellant's paying of his share of the initial payments. This involves a matter entirely different from a mere use of efforts to secure an option through personal services.  As to the money coming from Mr. Haskell, it is clear that it was not furnished or received until after the appellant had given his promissory note, jointly with Mr. Davis, and had secured the use of other money from the Nixon & Wingfield bank, with which he did pay for installments on the options; and that the Haskell money was used to pay off the personal obligations of the appellant.  Supposing the venture had failed after appellant had signed a promissory note, and after the bank had advanced him fifteen thousand dollars.  The appellant and Mr. Davis stood the risk of losing this money.  The Winslow or Patrick option provided for the forfeiture of the first installment paid in case the second was not forthcoming on time.  And the other option was given

in consideration of a fifty thousand dollar payment, which probably could not have been recovered if the deal had failed of consummation. The contract effecting the merger, by which the options were taken over by the Goldfield Consolidated Mines Company, was not executed until November 26, 1906. There were at least two weeks during which the success of the venture remained doubtful and uncertain.

Thus, to come back to the findings, it is at once manifest that finding 14, in stating that the defendant Botsford expended no money "of his own," is not equivalent to finding that he did not employ or use his credit in the purchase and acquisition of the option. It is a half finding, evasive and misleading, and embodies a conclusion rather than a fact.

All through the findings there are conclusions, such as that the defendant Botsford secured the option "under the alleged parol agreement"; that he took and held the option in his name "for the joint benefit of himself and plaintiffs"; that he received the hundred thousand shares of stock "for the joint benefit of himself and plaintiffs"; etc. All these findings of conclusions must be disregarded. Construing the findings by themselves, they would be contradictory of each other unless construed as above. The findings clearly show a mere constructive, implied or passive, participation of the plaintiffs in any of the transactions between the defendant and third parties. The findings show that the appellant paid twenty-five thousand dollars to Mr. Moore in cash, and not out of the stock. They find that third parties advanced money, and were repaid for money advanced to appellant. Suppose the venture had failed and there had been no stock. The moneys advanced would have had to be repaid, anyway, presumptively at least. The terms "advance" and "repay" imply an absolute obligation to repay. The court does not find that there was no such obligation. All these facts would have to be taken into consideration if this court confined itself within the four corners of the findings in construing them.

The record discloses no facts showing that the plaintiffs would have been or ever were liable for any part of the advances (see authorities below). The complaint, or the evidence, does not show that the alleged original agreement was ever modified, changed or enlarged by the parties to it. The court does not find that the plaintiffs and defendant Botsford subsequently agreed to employ capital in the venture and to share the losses, if any; nor who was to provide this capital, and in what proportion the parties should contribute to it. Presumptively none of them would agree to contribute an amount beyond his means. The plaintiffs confessedly had no means and no credit or financial ability to raise any money. There was no duty upon the appellant to provide money for all three, or any money at all.

These premises being conceded, how could the trial court find that with all the risk and liability to repay the advances resting upon the appellant he purchased the option for the benefit of himself and plaintiffs, and under the contract alleged and found as alleged, unless we construe the findings as we have done? It is not to be assumed that the court acted in disregard of all law. Neither have we any right to impute to the appellant such violent spasms of insanity, magnanimity or charitable instincts as we would otherwise have to impute to him.

Besides, unless we thus limit the meaning and effect of the findings, there would be a fatal variance between the pleadings and the proof. The findings, taken literally, would imply that the option was purchased with money provided by appellant for the account of all three; which would involve a contract, express or implied, on the part of the plaintiffs as well as the defendant Botsford to contribute capital and to share the losses, if any. The contract alleged and found by the court avowedly, and by reference to its terms, does not and did not contemplate the provision of capital by the parties thereto.

"The courts will not by implication impose upon the parties to the contract of joint adventure any duty or

obligation which is not reasonably or naturally inferable from the terms thereof." (23 Cyc. 457; *Hawkes* v. *Taylor,* 175 Ill. 344, 51 N. E. 611.)

Unless there had been an express promise on the part of respondents to repay to appellant their alleged share of the advances made by appellant, the law would have presumed that he was to be repaid out of the property acquired or its proceeds. (23 Cyc. 457; *Bell* v. *McAboy,* 3 Brewst. 81; *Williams* v. *Henshaw,* 11 Pick. 79; *Wilson* v. *Anthony,* 19 Ark. 16; *Lafon* v. *Chinn,* 6 B. Mon. 305; *Daw* v. *Darragh,* 48 N. Y. Super. Ct. 138.)

"Where one agrees to furnish the capital, and another services, to a joint venture, the latter is not liable for any part of the losses sustained." (*Ran* v. *Boyle,* 5 Bush. 253.)

"Contribution cannot be demanded where the party claiming it had no authority from the others to incur the expenses." (23 Cyc. 458; *Petri* v. *Tarrant,* 100 Mich. 117; 58 N. W. 690; 59 N. W. 941; *Norris* v. *Leavitt,* 61 N. H. 109; *Parshall* v. *Conklin,* 81 Pa. St. 487.)

Thus it would be obvious that the contract which the court finds by the finding of fact numbered 6, and which the court further finds by the 15th finding, "was acted upon by all the parties thereto," is an entirely different contract and would involve a transaction dissimilar from the purchase and sale of an option for a money consideration, set forth in findings 8, 13, 14 and 17. Hence, if we were to take the findings literally, all the findings of the court referring to the advance and expenditure of money, the purchase and sale of an option, the attempted allowance for expenditures and the direction that plaintiffs contribute in cash, and the attempted ascertainment of net profits, and all of findings 7, 8, 9, 10, 11, 12, 13, 14 and 17, would be inconsistent with and outside of the issues made by the pleadings and *coram non judice,* and the conclusions of law and the judgment based thereon would be null and void.

Such a result should be avoided if possible. General findings must give way to findings of specific facts, and such a construction of the findings will be adopted as

will render them consistent with the pleadings, and with each other, and as will bring them within the issues tendered by the pleadings in the case.  (8 Ency. Pl. & Pr. 949; *Barnes* v. *Sabron,* 10 Nev. 217; *Bank* v. *Lawrence,* 37 Pac. 936; *Whitlock* v. *Mauciet,* 10 Or. 166; *Brown* v. *McHugh,* 36 Mich. 433; *Edwards* v. *Nelson,* 51 Mich. 121; *White* v. *Abbott,* 87 Cal. 245; *Marshall* v. *Golden Fleece Co.,* 16 Nev. 156.)

Therefore, there is neither evidence, nor finding, nor pleading to show that respondents had any property in the option or in the proceeds from the sale of the option. No trust of any kind arises in their favor, since there was no title, interest or estate in or to any of the stock in the appellant's name or under his control, which in equity or good conscience belonged to the respondents.

If this be the correct conclusion, then there was no joint ownership or community of property, no trust of any kind, and no equitable interest or estate in the respondents, in or to any part of the stock, and the cases cited by respondent are inapplicable. (*Warwick* v. *Stockton,* 36 Atl. 490; *Simmons* v. *Lima Oil Co.,* 63 Atl. 260; *Dow* v. *McKinney,* 9 Allen, 359; *Petri* v. *Tarrant,* 58 N. W. 690; *Hughes* v. *Ewing,* 62 S.W. 474–477; *Coward* v. *Clanton,* 122 Cal. 451; *Prince* v. *Lamb,* 128 Cal. 128; *Miller* v. *Butterfield,* 79 Cal. 62; *Kayser* v. *Mongham,* 6 Pac. 803; *Yaeger & Grim's Appeal,* 100 Pa. St. 88; and other cases cited in our opening brief.)

All the connection claimed by respondents with any of these payments is that they "discussed" the fact that money was necessary with the defendant Botsford, but that they could not assist him in any way financially. They had a mere "idea or suggestion" that somebody with money could possibly be interested by appellant in the venture.  But this evidence was manifestly an afterthought, and untrue, since the plaintiffs in preparing their complaint in this action omitted all reference to disbursements and expenditures.  And outside of this evidence there is not even the remotest connection shown between plaintiffs and the purchase of the option.

The cases cited in respondents' brief are not applicable to the facts of this case. Not one of them holds that there can be any trust or other equitable estate or interest in property, or in profits as property, unless the party claiming such estate or interest can show that he has either directly or indirectly contributed money or property to the venture. There is no resulting trust in this case. There is no trust *ex maleficio.* There is no other kind of implied or constructive trust; for the mere reason that the respondents are not shown to have had any property rights in the option or in the capital used in acquiring the option. (*Latta* v. *Kilbourn,* 150 U. S. 524; 37 Law Ed. 1169; 15 Am. & Eng. Ency. Law, 1186, and cases cited under note 10; *Butts* v. *Cooper,* 44 South. 617, 619; *Smith* v. *Smith,* 45 South. 168.)

In *Camden Land Co.* v. *Lewis,* 63 Atl. 529, the court say: "The plaintiff claims that Sagamore and Sherman farms should be conveyed to it, because it says that the farms were bought for it; that W. D. Lewis, in making the original agreement to purchase, was then acting as its officer and agent. We have no doubt that at the beginning of the negotiations and during the greater part of the time after the owners agreed to sell, and until the deeds were given, Lewis intended that these farms should go to the complainant eventually. All the payments, however, were made by him out of his own funds, or at least out of funds which he thought belonged to him. He charged none of these payments to the company. The company never became bound to purchase either farm, or to repay Lewis for his disbursements. Before the deeds were obtained, and at a time when it was exceedingly doubtful whether the Lewises would be able to complete the payments, a new trust was formed. Money was raised from persons who had had nothing whatever to do with the previous transactions with the company, and with it was paid a balance due on the purchase of each farm. Upon a careful study of the evidence we are unable to find that any enforceable trust is established in favor of the plaintiff."

See also: *Miller* v. *Butterfield,* 79 Cal. 62; *Prince* v. *Lamb,* 128 Cal. 120; *Coward* v. *Clanton,* 122 Cal. 454.

There is not a single case, and we challenge the attorneys for the respondents to cite one, which holds that under the circumstances and facts of this case a party standing in the position of respondents has an interest in the property acquired by another with his own funds or credit, or in the proceeds from a sale thereof.

*Jones* v. *Davis,* 21 Atl. 1035, relied upon by respondents, does not so hold. In that case there was a declaration of an express trust, and the agreement was that one of the joint adventurers should furnish capital and the other personal services. The court said: "Davis had the title, and as between himself and the world was the sole owner; but under his declaration of trust he had that title subject to an interest of Jones in a moiety of the speculation, to be adjusted when his advances were reimbursed." Besides, in that case the court merely ordered the ascertainment of the money value of the profits for the purpose of enabling the court to award a general pecuniary recovery.

In *Delmonico* v. *Roudebush,* 5 Fed. 165, the plaintiff had advanced the money to pay for certain contracts, which were used in acquiring an interest in the mine. The court said: "But the fact remains that at the time of the appropriation by Roudebush the plaintiff was interested in the contract, and the use of it by Roudebush was without his consent. This is enough to enable the plaintiff to share in the advantages secured by Roudebush from the use of the contract. The ground of relief is the wrong done to the plaintiff in the use of his means."

The case of *Boqua* v. *Marshall,* 114 S. W. 714, which counsel for respondents claim to be "practically on all fours with the present case," is so different in its facts and in the law applicable to them, that it has absolutely no bearing on the case at bar. In that case there was no question of ownership of property involved. The action was brought by a member of a dissolved partnership firm to recover a share of a broker's commission earned by

the firm while it was in existence. The action was to recover a sum found due upon an accounting and statement of the net profits. The option in that case was paid for out of partnership funds. Said the court, on page 718 of the report: "Mordoff and his associates paid Boqua Jr. $1,000, which was forfeited when they failed to consummate their purchase. Boqua used this money as a payment to Latham when he secured the October option."

It is true that Boqua, one of the partners, borrowed the sum of $4,000, which he paid to Latham to prevent the option from lapsing, the option then being partnership property. He was allowed credit for this amount, with interest, upon the accounting had to ascertain the net profits. That was merely an advance by one partner for the benefit of the firm, and the partnership thereafter was the debtor, and the partner advancing the money to the partnership was its creditor.

What possible similarity that case has with the case at bar is not readily seen. This is an action to recover specific property, which the appellant was about to receive in payment for other property acquired with his own funds, and to which the respondents neither as individuals nor as members of an alleged joint adventure contributed a single cent. If this action had been brought for an accounting of net profits, and for the ascertainment of respondent's alleged share therein, and to recover a sum of money, then the case of Boqua v. Marshall, supra, might be said to contain some features which resemble some of the features claimed by the respondents in this case. But even then it would not be authority in the case at bar. Here, the purchase of the option was not made for a partnership by one of its members with partnership funds, or with funds advanced by one of the partners to the partnership or for its benefit. The purchase of the option by appellant was not made under the terms of the contract alleged in the complaint. That contract did not contemplate the use of capital or the "purchase" of an option. Appellant, not having the

power or authority of a general partner, could not have bound the respondents by his acts, and the latter did not offer or agree to be bound thereby, when they had an opportunity to claim the right to join in the purchase by virtue of the parol contract. Therefore, it could not be said, as was said in *Boqua* v. *Marshall,* 114 S. W. on page 717: "He was still a member of the firm when the new deal was made with Latham on October 27th, which was clearly but a continuation of the previous arrangement."

On the contrary, as was said in *Miller* v. *Butterfield, supra*: "Neither was obliged by the agreement to contribute to the purchase of a mine, though each may have been entitled to the opportunity to so contribute and to share in the purchase. Certainly they could not, one or more of them, allow another to make a purchase with his own funds, and at his own risk, and without being obliged to reimburse him in case of loss, claim the advantages of the bargain in case of gain." (*Miller* v. *Butterfield,* 79 Cal. 64.)

If, however, this court should hold that the appellant must in law be deemed to have furnished and procured all this capital under the alleged parol contract, then we insist that under the authorities and for the reasons stated in appellant's opening brief, the action should be dismissed.

See also: *Prince* v. *Lamb,* 128 Cal. 120; *Stiles* v. *Cain,* 134 Cal. 170.

*Second*—There can be no accounting of any kind in this action. The complaint should be dismissed.

It is very difficult to ascertain just what the contention of respondents' counsel is in their brief with reference to an accounting. Indeed, it seems that they have no definite theory upon which to justify an accounting of any kind in this case. Their understanding of the law and jurisprudence relating to accounting appears to be in a state of chaotic confusion, since they cite in one breath such widely distinctive cases as *Coward* v. *Clanton,* 122 Cal. 451, and *Kayser* v. *Mongham,* 6 Pac. 803.

The question raised by appellant in his opening brief

does not go to the power of the court, in a given case, to mete out either legal or equitable relief. That is too elementary under the system of practice and procedure prevailing in code states to admit of discussion in this court.

On the outset it must be remembered that the plaintiffs did not ask for an accounting in the court below, either in their complaint, or at the trial of the action; nor did the trial court proceed to an accounting, or order the parties to proceed to an accounting, before or during the trial of the action.

The circumstances surrounding this case are rather anomalous. The complaint shows no case for an accounting at all. It alleges a right in the plaintiffs, based upon a parol contract, to receive from the defendant Botsford two-thirds of the gross amount of a certain broker's commission, payable in shares of stock, which the plaintiffs aver to have been earned by the defendant Botsford through personal efforts, and with the assistance of personal services rendered by the plaintiffs to the defendant Botsford under the alleged parol agreement.

The complaint further alleges that the defendant Botsford had denied the right of plaintiffs to share in said commission; that he was about to collect it; that he was insolvent, and absent from the state; and that the plaintiffs had no adequate remedy at law.

The plaintiffs therefore by their complaint sought to intercept the stock, before it was delivered to the defendant Botsford by the party for whom it was payable, and the complaint prayed for purely equitable relief. It asked that the plaintiffs be decreed to be the owners, and entitled to the possession of two-thirds of the stock, and for an injunction to prevent the stock from being delivered to the defendant Botsford.

Assuming for the sake of argument, without admitting, that the complaint shows an equitable estate or interest, arising from some kind of an implied trust, in favor of the plaintiffs in two-thirds of the gross number of shares of stock alleged to be due and receivable, it is

clear that the complaint alleges no occasion for an accounting. There was nothing to ascertain, according to the complaint; and the defendant had nothing to account for, since the stock had not yet been delivered to him. In fact, an accounting would be inconsistent with the allegations of the complaint.

Likewise, the complaint excludes the possibility of damages, for the same reasons.

Therefore, the action being purely equitable, and no damages being alleged or possible under the facts shown, the district court would have been powerless under the pleadings to give final relief in this action in the form of a judgment at law for the recovery of a sum of money equal to the value of plaintiff's alleged proportion of the stock. (*Prince* v. *Lamb*, 128 Cal. 125–126; *S. F. P. Co.* v. *Fairfield*, 134 Cal. 225; *Hawes* v. *Dobbs*, 33 N. E. 560; 1 Pomeroy's Eq. Juris., 3d ed., secs. 170, 171.)

See note to *Bradley* v. *Aldrich*, 100 Am. Dec. 534.

It follows that, even if the evidence had disclosed that the defendant Botsford had already received the stock at the time of the commencement of the action and converted it into money before the injunction was issued, the plaintiffs could not have recovered the value of the stock in money under the pleadings in this action. (*Prince* v. *Lamb, supra; Faulkner* v. *Nat. Bank*, 130 Cal. 258; *Hawes* v. *Dobbs*, 33 N. E. 560; *Dykeman* v. *Keeney*, 154 N. Y. 483.)

It is claimed, however, that since the defendant Botsford obtained possession of the stock during the trial, and still had it in his possession or under his control at the trial and when the second injunction was issued, that the court below had the power to make the defendant Botsford account for the stock itself in kind, if not for its value in money, and as if it were trust property in his hands belonging to the plaintiff.

In our opening brief, we have cited authorities to show that there was no trust and that the plaintiffs had no property right in the stock, under the facts alleged in the complaint. The contract relied upon left the plain-

tiffs merely the creditors, at the end, of the defendant Botsford.

See also: *Coward* v. *Clanton*, 122 Cal. 451; 1 Pomeroy's Eq. Juris., sec. 178; *Kammermayer* v. *Hilz*, 82 N.W. 689; *Hopkins* v. *Hopkins*, 37 Atl. 371.

But, be that as it may, the court did not order the defendant to so account for the stock, by producing the same and delivering to the plaintiff the share claimed by them. On the contrary, the decree is *in rem* and orders a cancelation of the stock on the books of the corporation, and the transfer and issuance of the stock by the corporation. However, the disposition of the question depends upon entirely different principles, whereby it becomes immaterial to inquire whether or not that error in the judgment could be cured by merely ordering a new trial of the action.

The evidence and the findings show that the stock was not earned as a broker's commission, and that the personal efforts or services of the parties were powerless to start the venture contemplated by the alleged oral agreement. The owners of the controlling interest in the Combination Mines Company did not desire the services of brokers or agents to find a purchaser for their property. They were not looking for a purchaser and had no present intention to sell at all. In other words, the parties found no market for their services, and the venture concerning which they had agreed was at an end, so far as a broker's commission was concerned, when it was found that the option could not be secured except by the use of large sums of money.

The plaintiffs had no money nor the ability to procure any. The defendant Botsford took a partner into the new venture, who furnished a part of the money required to purchase the option. The remaining part of the purchase fund, including the sum of money paid to Mr. Moore, was furnished and provided by the defendant Botsford. The plaintiffs did nothing, provided nothing. They submitted in silence to being "excluded" by the defendant from the purchase and sale of the option, and

were willing to be "kept in the dark." In other words, according to their own story, the plaintiffs sat by in silence and awaited the result.

From these premises we draw several conclusions:

1. The findings and the evidence show that the alleged parol agreement was either abandoned, or else that while it remained executory the defendant Botsford repudiated it, because of the unexpected conditions, and proceeded to conduct the enterprise at his own cost, in his own name and for his exclusive benefit, and excluded the plaintiffs from it because they could not and did not provide any of the necessary money.

In either event, the plaintiffs had no legal interest in the venture, and were not part owners of the option, nor entitled to any of the proceeds derived from the sale thereof. And they were not entitled to an accounting of any kind. The purchase and sale did not transpire under the alleged parol agreement. (*Powell* v. *Maguire*, 43 Cal. 11; *Mann* v. *Bowen*, 85 Ga. 618; *Prince* v. *Lamb*, 128 Cal. 127, 128; *Hyer* v. *Richmond T. Co.*, 168 U. S. 484; *Hawes* v. *Dobbs*, 33 N. E. 560; *Latta* v. *Kilbourn*, 150 U. S. 524; 15 Am. & Eng. Ency. Law, 1186–1187; *Camden Land Co.* v. *Lewis*, 63 Atl. 529–530; *Butts* v. *Cooper*, 44 South. 619; *Smith* v. *Smith*, 45 South. 168; *Kayser* v. *Mongham*, 6 Pac. 803; *Miller* v. *Butterfield*, 79 Cal. 62; *Emery* v. *Mason*, 75 Cal. 222.)

As was said in *Miller* v. *Butterfield*, 79 Cal. 62, 64: "As to mines bought, the parties were tenants in common only upon the condition (necessarily implied), that they should contribute equally to the purchase fund.

"Neither was obliged by the agreement to contribute to the purchase of any particular mine, though each may have been entitled to the opportunity to so contribute, and to share in the purchase.

"Certainly they could not, one or more of them, allow another to make a purchase with his own funds, and at his own risk, and without being obliged to reimburse him in case of loss, claim the advantages of the bargain in case of gain.

"We think that the fact that the defendant alone provided the funds for the purchase of the properties in question, that the plaintiffs not only did not, but could not, and were in no wise bound to, contribute any share of the purchase money, is fatal to their claim to an interest in such properties."

2. But, even if this court were inclined to hold that the purchase and sale of the option took place under the alleged parol agreement, and that it was a continuing and single transaction, the contract itself would be so unfair to the appellant, and the assistance given him by the plaintiffs so grossly inadequate, that no court of equity would enforce it in any form. (*Prince* v. *Lamb,* 128 Cal. 128, and authorities cited in appellant's opening brief.)

3. Moreover, the "profits" alleged and the "profits" proved and found are two widely different propositions.

The contract relied upon deals with conventional profits. It contemplates no outlay of capital; hence there could be no "real profits," as that term is usually understood among merchants. (*Coward* v. *Clanton,* 122 Cal. 454.)

As was said in another case, "the contract, taken as a whole, is not one for a division of profits, but rather for a moiety" of whatever might be received in compensation for the services pooled under the alleged parol agreement. (*Prince* v. *Lamb,* 128 Cal. 126.)

The contract alleged in the complaint provided for no capital. Within the contemplation of the parties to it no money would be required to carry it out. They expected to merely give time and services. Hence the profits they expected were the emolument, the compensation, the commissions paid to brokers or agents effecting the sale of property belonging to other persons. The business covered by the contract was of such a character that loss could not occur. They were neither to purchase nor sell property. They were to incur no expense. They were to act simply as brokers, finding vendor and purchaser and bringing the two together. The option in the alleged

parol agreement was nothing more than an agent's authority to negotiate the sale of the property of his principal. Hence the "profits" of the contract meant the gross amount to be received, without any deduction, and of that each was to have one-third. Thus the contract of the parties fixed the "profits" of each as definitely as could be, having reference to a future event.

But the "profits" indicated by the findings of fact and the evidence were "net profits," or real profits; or so much of the entire difference between the advances and the value of the returns, as arose exclusively from the capital employed. (23 Cyc. 586, and authorities cited.)

Those profits were based upon the use of capital, and involved a purchase and sale of property by the appellant, and his associate, Davis, as principals.

Obviously, the complaint sets forth no cause of action with reference to such profits; and the "profits" attempted to be determined by the trial court in its findings of fact constituted a subject, and involved a transaction, entirely foreign to and outside of the issues in the case.

No such "profits" could legally be ascertained or distributed in this action. (*Bachman* v. *Sepulveda*, 39 Cal. 688; *Perkins* v. *Sierra Nevada*, 10 Nev. 413; *Frevert* v. *Henry*, 14 Nev. 195; *Hopkins* v. *Orcutt*, 51 Cal. 537; *Riverside Water Co.* v. *Gage*, 89 Cal. 410; *Prince* v. *Lamb*, 128 Cal. 126–128; *Booker* v. *Aitken*, 140 Cal. 472; *San Luis* v. *Estrada*, 117 Cal. 182; *Sigourney* v. *Zellerbach*, 55 Cal. 431; *Sterling* v. *Hansen*, 1 Cal. 478; *Marshall* v. *Golden Fleece*, 16 Nev. 156, and authorities cited in appellant's opening brief.)

If the foregoing premises are correct, then it follows that no accounting of any sort could be had in this action.

The remedy of accounting, in a case like this, is a mere incident to the main relief which the court might possibly grant in the action. (*Root* v. *L. S. & M. S. R. Co.*, 105 U. S. 208–217; 1 Pomeroy's Eq. Juris., sec. 237, p. 341.)

If the court cannot grant any relief, because the plain-

tiffs have not shown a right to any relief in the action, the remedy of accounting must naturally fail as well. It is not a question of power in the district court to administer both legal and equitable remedies, as erroneously assumed by counsel for respondents. It is a question of whether or not the plaintiffs have shown a cause of action entitling them to any relief. (*Hawes* v. *Dobbs,* 33 N. E. 560, 561; *Prince* v. *Lamb,* 128 Cal. 120.)

But, apart from the question of power to retain the case for the purpose of administering any suitable remedy, the court below could not have properly retained the case, and this court could not now properly reverse the judgment for the mere purpose of granting a new trial.

The plaintiffs testified, and their counsel admit, that before the option was even acquired by the defendant Botsford, the plaintiffs had knowledge that large sums of money were required to secure the same. Yet they failed to allege such fact in their complaint and to ask for an accounting of "net profits." Clearly, therefore, they did not bring this action for a share of the gross receipts in good faith. They came into equity without offering to do equity. Under those circumstances the court will not retain the case for the purpose of giving relief by way of damages or any other pecuniary relief. (4 Pomeroy's Eq. Juris., sec. 1410.)

And the evidence discloses no case for an accounting. (*Dorr* v. *McKinney,* 9 Allen, 359; *Corbin* v. *Holmes,* 154 Fed. 598–601; *Simmons* v. *Lima Oil Co.,* 63 Atl. 260.)

*Detch & Carney, Thomas, Bryant & Malburn,* and *R. G. Withers* (*Mack & Green* and *Horatio Alling,* of counsel), for Respondents.

By the Court, Sweeney, J.:

This action is brought by the plaintiffs L. C. Van Riper and Joseph Hutchinson to recover from the defendant Charles H. Botsford two-thirds of the profits of a deal whereby the Goldfield Mohawk Mining Company and

other mining interests paid as a commission to the defendant, Botsford, 100,000 shares of the Goldfield Consolidated mining stock then valued at $1,000,000, in consideration of his turning over a certain option which he held on the Combination Mines Company, which made it possible to merge the properties now constituting the Goldfield Consolidated Mines Company, and do away with certain threatened apex litigation then pending and other suits about to be started. This commission of $1,000,000 was earned during a period not in excess of forty-five days from the time the parties conceived and agreed to carry out their agreement along the lines of merging the properties to avoid litigation, and is but illustrative of the opportunities which are ever present in mining excitements in great mining camps to those who may be quick, able, and fortunate enough to grasp an opportunity and successfully put it through to a termination. Though this action was commenced by the respondents L. C. Van Riper and Joseph Hutchinson as plaintiffs against Charles H. Botsford and other above-named appellants as defendants, the real controversy is between the respondents L. C. Van Riper and Joseph Hutchinson and the appellant, Charles H. Botsford. All the other appellants joined with Botsford are in the case nominally, and so far as this case is concerned do not seem to have any real interest in the dispute.

The complaint is one based on the doctrine of joint adventure, a doctrine of modern origin, and in effect alleges, in our judgment, the necessary allegations, which, if proved, entitle the plaintiffs to the judgment accorded them. The complaint in effect alleges:

"First—That the plaintiffs and defendant Botsford entered into an agreement to use their joint efforts for the purpose of securing a certain option and selling the same.

Second—That it was agreed that defendant Botsford should be the active agent of the adventure in the securing of the option and the sale of the same.

"Third—That the plaintiffs assisted in the furtherance of the venture in divers and sundry ways by counsel, introductions, and personal efforts.

"Fourth—That it was agreed in the event of the consummation of the venture the plaintiffs and the defendant Botsford should share equally in the profits realized.

"Fifth—That the adventure was successfully terminated under said agreement, and that the defendant Botsford was to receive 100,000 shares of stock of the value of $1,000,000 as compensation.

"Sixth—That defendant Botsford was attempting to get possession and control of all of said shares of stock, and refused to recognize the plaintiffs as being entitled to any portion of the same as compensation for the securing and sale of said option.

"Seventh—That the defendant was without this state and insolvent.

"Eighth—Follows then the prayer that the plaintiffs be declared to be the owners of and entitled to a one-third each of any and all compensation either in stock or otherwise, which the defendant was entitled to by virtue of the consummation of the venture, and for an injunction restraining, and so forth."

To this complaint a demurrer was filed, and thereafter an answer, which was thereafter amended. The answer denies all of the allegations of the complaint which would in any way connect the plaintiffs with the said defendant Botsford as a coadventurer in putting through the deal, and denies that there was ever any agreement or contract entered into at any time betwen the three parties concerning the subject-matter in the suit. The answer squarely raises the issue as to whether such an agreement, as alleged in the complaint, was made, and upon this substantial issue the case went to trial.

It appears from the testimony adduced, a record of some 3,000 pages, that Charles H. Botsford, the appellant, a New York promoter, an educated gentleman, and a mining expert of some reputation, and a business man of large affairs, during the fall of 1906 came to Goldfield,

Nevada, when that camp was at the height of its mining excitement and prosperity. He came there for the purpose of investigating the conditions of a lease controlled by the plaintiff Van Riper, whom he had met in New York. Mr. Botsford had invested $15,000 in this lease, and more money being required to work said lease, the purpose of his visit to Goldfield was to determine the advisability of saving the investment, which would have been lost providing further capital was not forthcoming.

While in Goldfield on this mission, Mr. Botsford met the plaintiff Joseph Hutchinson, a mining engineer and promoter of wide experience and reputation and commendable ability, and learned that litigation had been or was about to be commenced by the Combination Mines Company against the Mohawk properties, claiming that the Mowhawk veins apexed in the Combination ground. At this time this threatened litigation, which, unless averted by compromise or otherwise determined, would paralyze the prosperity of the district, then in the throes of the wildest kind of a mining boom, caused the people of the camp of Goldfield the most tense feeling of excitement, apprehension, and anxiety, awaiting and hoping for a peaceful compromise or determination of this gigantic legal battle which seemed imminent, and which litigation would, for some time at least, tie up some of the richest mines in the very heart of the Goldfield mining district.

It is contended by Hutchinson, and so alleged in the complaint, and found in the findings of the lower court, which, after a most careful review, owing to the great conflict of testimony on all the material issues, we have concluded not to disturb: That he conceived the idea of having the Combination Mines Company and the Goldfield Mohawk Company merge their interests for the purpose of avoiding threatened litigation over the extralateral and other rights of said companies and the mining ground claimed and owned by them, respectively, and during the month of September, 1906, he called the attention of his coplaintiff, L. C. Van Riper, and of the defendant Charles H. Botsford thereto, and submitted to them the idea of

securing an option upon the control of the capital stock of said companies or either of them, and also submitted to them his scheme of consolidating or merging the interests of said companies. That the plaintiff L. C. Van Riper and the defendant Charles H. Botsford immediately became interested in such suggestions and in the scheme of consolidation or merger proposed by the plaintiff Hutchinson, and thereafter and during the months of September and October, 1906, they, in conjunction with plaintiff Joseph E. Hutchinson, made investigations and consulted with each other as to the most feasible plan of securing an option upon the control of the capital stock of said companies, or either of them, and also the most feasible plan of consolidating and merging the interests of said companies.

During all of said time the plaintiffs and the defendant Charles H. Botsford were jointly interested in other promotions and in other business enterprises. On or about the 27th day of October, 1906, in Goldfield, Nevada, an agreement was made and entered into by and between the defendant Charles H. Botsford and the plaintiffs L. C. Van Riper and Joseph Hutchinson, wherein and whereby they agreed to adopt the ideas and suggestions made by the plaintiff Joseph Hutchinson, and to use their joint efforts to secure an option upon the control of the capital stock of the Combination Mines Company for the purpose of effecting a sale thereof, and they also agreed to use their joint efforts to bring about a consolidation or merger of the interest of the Combination Mines Company with other corporations then existing, or thereafter to be organized.

It was also agreed by and between said parties in and by the terms of said agreement that any and all profits, commissions, or compensation that might be realized or made from such enterprise or from their or either of their efforts in the premises should be divided equally between them; that is to say, that the defendant Botsford should receive one-third thereof, and the plaintiffs Hutchinson and Van Riper should each receive one-third

thereof. It was also agreed by and between the parties in and by the terms of said agreement that the defendant Botsford should have the exclusive charge and control of all negotiations relative to the obtaining of said option and the sale thereof and the effectuating of such merger, but that in conducting such negotiations the defendant Botsford should act for and represent the plaintiffs as well as himself.

It was also agreed that each of the plaintiffs should render such services in the premises as might be required of him by the defendant Botsford and under his direction. Pursuant to the terms of the agreement, and on or about the 14th day of November, 1906, the plaintiffs and the defendant Botsford secured an option upon the controlling interest in the capital stock of the Combination Mines Company, said option being taken in the name of the defendant Botsford to enable him to more effectually conduct the negotiations necessary for the sale thereof and the consummation of said merger, but that said option was taken in his name and held by him for the joint benefit of himself and each of the plaintiffs.

Thereafter, on or about the 5th day of December, 1906, the defendant Botsford sold and assigned said option to the defendant Goldfield Consolidated Mines Company. That by securing the said option and the sale and assignment thereof to the defendant Goldfield Consolidated mines Company a merger was brought about and effected between the Combination Mines Company and the Goldfield Mohawk Mining Company. That during all of the negotiations which resulted in the obtaining of said option and the sale and assignment thereof to the defendant Goldfield Consolidated Mines Company, the plaintiffs rendered such services as were required of them. That at all of said times the defendant Botsford acted under and in accordance with the terms of the agreement aforesaid, and during all of such negotiations the defendant Botsford acted for and represented the plaintiffs as well as himself. That, in consideration of the obtaining of said option and the sale and assignment

thereof to the defendant Goldfield Consolidated Mines Company, the defendant Botsford was to receive, and did receive, for the joint benefit of himself and the plaintiffs, 100,000 shares of the capital stock of the Goldfield Consolidated Mines Company, which said stock was worth at the time of the commencement of this action $1,000,000, or $10 per share. That out of said 100,000 shares so received by the defendant Botsford 55,000 shares thereof were issued and delivered to parties other than the plaintiffs, who advanced moneys to enable the plaintiffs and the defendant Botsford to make the initial payments upon said option.

The defendant Botsford received from the defendant Goldfield Consolidated Mines Company 45,000 shares of its capital stock as net profit, commission, and compensation for securing the option aforesaid and for the sale and assignment thereof to the said defendant Goldfield Consolidated Mines Company. That said stock was received by the defendant Botsford under and in accordance with the terms of the agreement made and entered into between himself and the plaintiffs L. C. Van Riper and Joseph Hutchinson, and said stock was received by him for the joint benefit of himself and the plaintiffs Van Riper and Hutchinson. That at the time of the commencement of this action an injunction was issued out of the lower court restraining the defendant Goldfield Consolidated Mines Company from issuing or delivering said stock to any person or persons, company or companies, until the final determination of this action; but that, notwithstanding such injunction, the defendant Goldfield Consolidated Mines Company did, at the request of the defendant Botsford, issue to and in the name of John S. Cook as trustee, certificates representing said 45,000 shares of the capital stock of said company.

During the time said certificates were issued and held by said John S. Cook as trustee, dividends amounting to the sum of $9,000 were declared upon said 45,000 shares of stock, and that all of said sum of $9,000 was paid to and received by the defendant Botsford, and by him

appropriated to his own use, and that no part thereof was paid to the plaintiffs, or either of them. On or about the 5th day of December, 1907, the injunction heretofore issued in this action was by order of the lower court dissolved, and immediately thereafter the certificates representing the said 45,000 shares of the capital stock of the Goldfield Consolidated Mines Company which had been issued to, and in the name of, John S. Cook, as trustee, were indorsed by him and delivered to the defendant Botsford, and thereafter the defendant Botsford surrendered said certificates to the defendant Goldfield Consolidated Mines Company, and caused new certificates in lieu thereof to be issued as follows, to wit: A certificate or certificates representing 2,000 shares thereof in the name of George S. Nixon and a certificate or certificates representing 43,000 shares thereof in the name of M. Toping. That no consideration whatever was paid by said M. Toping or received by the defendant Botsford for the certificates so issued in the name of M. Toping, and no part of said stock was ever delivered to the said M. Toping, but the certificates representing all of said 43,000 shares of stock were delivered to the defendant Botsford, and said certificates were issued in the name of M. Toping at the request of the said defendant Botsford, and to subserve his own purposes, and the defendant Botsford thereafter procured and caused the said M. Toping to indorse the same, and the defendant Botsford has at all the times since the issuance of said certificates had the same in his posssssion and under his control. That certificates representing 30,000 shares of the capital stock of the Goldfield Consolidated Mines Company so issued in the name of M. Toping, and delivered to the defendant Botsford, still remain in the possession and under the control of said defendant Botsford.

During the trial of the above-entitled cause in the lower court and on or about the 29th day of January, 1908, an injunction was issued out of said court, restraining the defendant Botsford from transferring or in any manner disposing of 30,000 shares of the capital stock of the Gold-

field Consolidated Mines Company so held by him for which certificates were issued in the name of M. Toping, and also restraining the defendant Goldfield Consolidated Mines Company from transferring any part of said 30,000 shares of the capital stock of said company, for which certificates were issued in the name of M. Toping, or from doing any other act that would render ineffectual any judgment that may be rendered in this action.

At or about the time the plaintiffs and the defendant Botsford secured an option upon the stock of the Combination Mines Company, an agreement was made and entered into by and between the defendant Botsford and C. J. Moore wherein and whereby it was agreed that the said Moore, in consideration of services rendered or to be rendered by him in and about the premises, should receive a share of whatever profits the defendant Botsford might make out of said proposed merger, but this agreement was thereafter modified by said parties, and, in lieu of an interest in the profits, said Moore was paid the sum of $25,000 in cash, and said sum of $25,000 was accepted by said Moore in full payment of any and all services rendered or performed by him in the premises, and in satisfaction of any claim that he might have to an interest in said profits under the terms of the agreement made and entered into with him as aforesaid. That the defendant Botsford did not expend any moneys of his own in the securing of said option or in the effecting of said merger, but that all moneys necessary for that purpose were secured from other parties, and that said parties were repaid and compensated for the moneys advanced by them out of the 100,000 shares of the capital stock of the Goldfield Consolidated Mines Company, which was received as a gross profit, commission, and compensation for the securing and assignment of said option. That the plaintiffs have fully performed each and all of the terms, covenants, and conditions of said agreement to be by them kept and performed, and they have during all of the negotiations which resulted in the securing of said option and the effecting of said merger furnished the

defendant Botsford with such information and money and have performed such services as were required of them. That the agreement made and entered into between the defendant Botsford and the plaintiffs was acted upon by all of the parties thereto.

On these findings of fact the lower court awarded a judgment to each of the plaintiffs of 15,000 shares of the capital stock of the Goldfield Consolidated Mines Company as their portion of the commission in stock and $6,000 accrued dividends on said 30,000 shares of stock, less one-third each of $25,000 in cash which was paid to Mr. Moore by appellant. From this judgment and order of the lower court denying appellant's motion for a new trial, this appeal is taken.

It is strenuously argued by the able and eloquent counsel who represent the appellant in this case that the whole agreement, as alleged in the complaint, never in fact existed, and from start to finish there was a conspiracy on the part of the respondents to defraud the appellant out of the two-thirds of the profits of this deal, which he contends was conducted solely by him and without any agreement whatever between the respondents L. C. Van Riper and Joseph Hutchinson and himself, and that they were not in any way interested or concerned.

The lower court, in its opinion, in speaking of this conspiracy to deprive Botsford out of a substantial portion of his commission, says: "It is very earnestly and eloquently contended in Mr. Botsford's behalf that a conspiracy was entered into by the plaintiffs and Webster Bishop to defraud Botsford of a substantial part of the fruits of his labors. There is absolutely no evidence in this case which would warrant the court, even by the remotest inference, in concluding that a conspiracy was entered into. A conspiracy must be established by clear and convincing proofs, and not by the tenuous inferences or exsufflicate surmises of counsel, however cunningly awakened or eloquently depicted."

A very careful review of the testimony in this case

convinces us, also, that such a conspiracy has not been proven, neither do we feel warranted in saying, after a most thorough examination of the entire record, that there is not such sufficient substantial evidence introduced to have warranted the lower court in its findings on which it predicated the judgment in this case against the appellant. Further, we are of the opinion that there is such a substantial conflict of testimony on all the material points and issues raised that we would not be justified or authorized to depart from the well-established law in this state that, where there is a substantial conflict in the testimony on material issues, this court will not disturb the findings of fact in the lower court.

The main point in this whole controversy is, as we view the case, whether or not such a legal enforceable agreement has been pleaded under the doctrine of joint adventure in the complaint of respondents as to justify the lower court, if such an agreement as pleaded is proven, to have rendered the judgment and decree that it did in behalf of plaintiffs. We are of the opinion that the complaint states a good cause of action under the doctrine of joint adventure, and the findings of fact on which the judgment of the lower court was found are sufficiently broad to maintain that judgment.

Counsel for the appellant contend that no legal agreement is pleaded, in that there is no consideration on the part of respondents sufficiently plead or proven to warrant the court in enforcing the contract alleged in the complaint, even conceding that such an agreement as pleaded was entered into. Counsel seem to be of the impression by reason of the fact that appellant did most of the negotiations and work of putting through the deal that the small part played by respondents, even if their testimony granted be true, would not be sufficient consideration on which to create a valid contract that could be enforced. In this respect we totally disagree. If the respondents entered into a mutual agreement with appellant, as alleged in the complaint, to secure the option in question for the purpose of making the deal, and did no

more than to make the suggestion by advice and counsel, and pointed out to appellant the status of the properties in controversy and the scheme which led up to the deal, and placed the appellant in touch with the situation, and the appellant agreed to do all the other work in consummating the idea and plan of merging the properties into the deal, and agreed with respondents to divide equally the profits of the deal, this mutual agreement, founded on mutual promise of aid, assistance, counsel, and effort, would be a sufficient consideration to support the contract under the doctrine of joint adventure. (23 Cyc. 454; *Alderton* v. *Williams*, 139 Mich. 296, 102 N. W. 753; *King* v. *Barnes*, 109 N. Y. 267, 16 N. E. 332; *O'Hara* v. *Harman*, 14 App. Div. 167, 43 N. Y. Supp. 556; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Gorham* v. *Heiman*, 90 Cal. 346, 27 Pac. 289; *Jones* v. *Patrick*, 140 Fed. 403; *Shea* v. *Nilima*, 133 Fed. 209, 66 C. C. A. 263.)

We do not wish to be understood, however, from what we have stated, that we doubt respondents did not do a great deal more than appellent gives them credit for in bringing to a successful termination this mining deal from which the profits of the commission sued upon originated. The lower court in commenting on this point very properly says: "Common honesty requires that every person who makes an agreement should effectually live up to it, whether the agreement involves a merger of large mining interests or is simply an ordinary transaction, and the mere fact that one of the parties may have contributed more than his quota of talent and energy to the consummation of the deal does not justify him in disavowing his promise, or of refusing to give to his associates what he agreed should be theirs."

The law is well established that property purchased or acquired in connection with a joint adventure or profits realized from a joint adventure of the joint property of the parties interested, where one party holds title to the same, that such property is held in law to be the property of his associates, and the party holding the same is holding their proportionate share as trustee for them.

(23 Cyc. pp. 455–459; *Hayden* v. *Eagleson*, 15 N. Y. St. Rep. 200; *Fueschsel* v. *Belleshiem*, 14 N. Y. St. Rep. 610; *Richardson* v. *McLean*, 80 Fed. 854, 26 C. C. A. 190; *Morris* v. *Wood*, 35 S. W. 1013; *Lyles* v. *Styles*, 15 Fed. Cas. p. 1143, No. 8,625; *Cunningham* v. *Davis*, 47 S. W. 140; *Matthews* v. *Kerfoot*, 64 Ill. App. 571; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *Putnam* v. *Burrill*, 62 Me. 44; *McCutcheon* v. *Smith*, 173 Pa. 101, 33 Atl. 881; *Getty* v. *Devlin*, 54 N. Y. 403; *Church* v. *Odell*, 100 Minn. 98, 110 N. W. 346; *Knapp* v. *Hanley*, 108 Mo. App. 353, 83 S. W. 1005; *Hancock* v. *Tharpe*, 129 Ga. 812, 60 S. E. 168; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Marston* v. *Gould*, 69 N. Y. 220; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *Williams* v. *Love*, 2 Head, 80, 73 Am. Dec. 191; *King* v. *Wise*, 43 Cal. 628.)

We further find that the law is well established that the relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee, to whom the deal or property may be entrusted, and that such trustee will be held strictly to account to his coadventurers, and that he will not be permitted by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater rights in the property by reason of the fact that he is in possession of the property or profits as trustee than his coadventurers are entitled to. The mere fact that he is intrusted with the rights of his coadventurers imposes upon him the sacred duty of guarding their rights equally with his own and he is required to account strictly to his coadventurers, and, if he is recreant to his trust, any rights they may be denied are recoverable. (23 Cyc. 455; *Cole* v. *Bacon*, 63 Cal. 571: *Hambleton* v. *Rhind*, 84 Md. 456, 36 Atl. 597, 40 L. R. A. 216; *Seehorn* v. *Hall*, 130 Mo. 257, 32 S. W. 643, 51 Am. St. Rep. 562; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Getty* v. *Devlin*, 54 N. Y. 403; *Hollister* v. *Simonson*, 18 App. Div. 73, 45 N. Y. Supp. 426; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Delmonico* v. *Roudebush*, 5 Fed. 165;

*Morris* v. *Wood*, 35 S. W. 1013; *Knapp* v. *Hanley*, 108 Mo. App. 353, 83 S. W. 1005; *O'Hara* v. *Harman*, 14 App. Div. 167, 43 N. Y. Supp. 556; *Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *King* v. *Wise*, 43 Cal. 628.)

Counsel for appellant seem to lay stress on the fact that by reason of the appellant putting up most of the costs in putting through this deal, and the fact that the respondents were financially embarrassed, that this is further proof indicative of the weakness of or lack of the consideration of the agreement sought to be enforced. As before stated, the mere mutual promise of the parties furthering and rendering their aid, advices, and suggestions, if agreed to was sufficient consideration to support the contract under joint adventure; but the law is well established that the furnishing of capital by the parties to a joint adventure is not necessary to the validity of the contract, so long as the original agreement on which the contract was entered into was carried out. (*Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Van Tine* v. *Hilands*, 131 Fed. 124.)

The evidence discloses, and the findings of the lower court are to the effect, that the respondents performed their part of the contract entered into, and stood ready at all times to further aid, as far as laid in their power, pursuant to their agreement, the consummation of the deal originally agreed upon. That they were not called upon to do so by appellant is not a sufficient reason in law or equity to invalidate their right to share in the profits of the deal, because the appellant saw fit to take the reins and do most or all of the work himself after the original agreement was made and entered into.

The fact that it required large sums of money to carry the deal through, counsel for appellant seem to believe vitiates the consideration of the agreement alleged, for the reason it is admitted respondents were practically penniless. We fail to see any merit in this contention. Appellant himself did not possess the means to carry the transaction through, and, in order to acquire means to do so, appellant bartered away 50,000 shares of the commis-

sion which belonged jointly to the parties to the agreement, and which was valued at $500,000, for the use of $50,000 in cash from Mr. Davis, and bartered away another 5,000 shares of the commission to result from the deal in consideration of $25,000 cash advanced by Mr. Haskell. Money was not the consideration of the agreement advanced on the part of the respondents, nor is it so pleaded nor contended, but it was the scheme, claimed to have originated in the brain of Hutchinson, and supplemented by advice and aid of Hutchinson and Van Riper, and bringing to the attention of Botsford the possibilities of the deal, which are the very good and sufficient considerations advanced by respondents, as against the carrying out of the plan of the deal by Botsford, to the exclusion of seeking or accepting less and less aid and advice *ex industria* from the respondents, as the success of the venture became more apparent and effected.

Money advanced by one party to a joint adventure is held to be a loan to the venture, for which the party is entitled to be reimbursed out of the proceeds of the venture; but, by reason of the advancing of such money, it does not entitle the party so advancing to any superior right as against his coadventurers. (23 Cyc. 457, 458; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Thurston* v. *Hamblin*, 199 Mass. 151, 85 N. E. 82; *Stone* v. *Wright Wire Co.*, 199 Mass. 306, 85 N. E. 471; *Burhans* v. *Jefferson*, 76 Fed. 25, 22 C. C. A. 25; *Sanguinett* v. *Webster*, 153 Mo. 343, 54 S. W. 563; *Woodward* v. *Holmes*, 67 N. H. 494, 41 Atl. 72; *Leamy* v. *Fisler*, 52 Atl. 703; *Rankin* v. *Black*, 1 Head, 650; *Crenshaw* v. *Crenshaw*, 61 S. W. 366, 22 Ky. Law. Rep. 1782; *Williams* v. *Love*, 2 Head, 80, 73 Am. Dec. 191; *Gee* v. *Gee*, 2 Sneed, 395; *Withers* v. *Pemberton*, 3 Cold. 56; *Furman* v. *McMillian*, 2 Lea, 121; *Finlay* v. *Stewart*, 56 Pa. 183; *Stover* v. *Flack*, 30 N. Y. 64; *Doane* v. *Adams*, 15 La. Ann. 350; *Bell* v. *McAboy*, 3 Brewst. 81.)

The law is also well established that, in the absence of an express agreement, the law implies an equal division of the profits of a joint adventure without regard to any inequality of contribution. (23 Cyc. 459; *Wetmore* v.

*Crouch*, 150 Mo. 671, 51 S. W. 738; *Knapp* v. *Hanley*, 108 Mo. App. 353, 83 S. W. 1005; *Van Tine* v. *Hilands*, 131 Fed. 124; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035.)

Counsel for the appellant assign as error the decree of the lower court, in that it awards plaintiffs a share of the stock rather than a money judgment, and that in this action the court, under the pleadings, was not authorized to have made an accounting between the parties. The law, however, is well established that a party to a joint adventure holding the profits of the venture may be held to account to his coadventurers for their share of the property representing such profits in kind, and we see no error in the court giving respondents their share of the stock.

In the case of *Delmonico* v. *Roudebush*, 5 Fed. 165, the plaintiff demanded that he be declared the owner of a one-sixteenth interest in a certain mine. The court found that the defendant held a one-fifth interest in the mine as the net compensation for negotiating the purchase and sale of a certain option and gave the defendant a one-sixteenth interest of the one-fifth interest found to represent the net profits of the transaction.

In the case of *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570, a certain proportion of stock held by the defendant as net profits of a joint adventure was awarded to the plaintiff. The profits of a joint adventure may consist, not alone of money, but of the unsold portion of the property which was the subject of the venture, or of property received as compensation for services rendered in connection with the venture. (23 Cyc. 460; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035; *Scott* v. *Clark*, 1 Ohio St. 382; *Delmonico* v. *Roudebush*, 5 Fed. 165; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Marston* v. *Gould*, 69 N. Y. 220.)

It is also well settled in law that one party to a joint adventure may sue the other at law for the breach of the contract, or share of the profits or losses, or a contribution for advances made in excess of his share, but the remedy

at law does not preclude a suit in equity for an accounting. In this state, under our code of procedure, the district court in proper cases may administer both legal and equitable relief. (23 Cyc. 453–461; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570; *Petrie* v. *Torrent*, 88 Mich. 43, 49 N. W. 1076; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *McElroy* v. *Swope*, 47 Fed. 380; *Van Tine* v. *Hilands*, 131 Fed. 124; *Edson* v. *Gates*, 44 Mich. 253, 6 N. W. 645; *King* v. *Barnes*, 109 N. Y. 267, 16 N. E. 332; *Bradley* v. *Wolff*, 40 Misc. Rep. 592, 83 N. Y. Supp. 13; *Marston* v. *Gould*, 69 N. Y. 220; *Kirkwood* v. *Smith*, 47 Misc. Rep. 301, 95 N. Y. Supp. 926–929; *Jones* v. *Davis*, 48 N. J. Eq. 493, 21 Atl. 1035; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *Flower* v. *Barnekoff*, 20 Or. 132, 25 Pac. 370, 11 L. R. A. 149; *Corbin* v. *Holmes*, 154 Fed. 593, 83 C. C. A. 367; *McMullen* v. *Hoffman*, 75 Fed. 547.)

One party to a joint adventure may set off against the demand of another amounts advanced by him toward the venture or payments made by him in behalf of the plaintiffs; and in this respect the court was justified in so deducting the amount expended by the appellant in behalf of Moore from the judgment given in favor of respondents. (23 Cyc. 461; *Armstrong* v. *Henderson*, 99 Va. 234, 37 S. E. 839; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714.)

We do not believe there is any merit in the contention of the appellant that the court erred in making an accounting of the amount expended, and in deducting the same from the amount found to be due plaintiffs, as the law applicable to the rules of partnership applies to joint adventures, and in suits between partners for amounts due them accountings are always allowed in an action of this character. The rules and principles of the doctrine of partnership apply generally to the relation of joint adventure. (*Church* v. *Odell*, 100 Minn. 98, 110 N. W. 346; *O'Hara* v. *Harman*, 14 App. Div. 167, 43 N. Y. Supp. 556; *Marston* v. *Gould*, 69 N. Y. 220; *Wilcox* v. *Pratt*, 125 N. Y. 688, 25 N. E. 1091; *Kirkwood* v. *Smith*,

47 Misc. Rep. 301, 95 N. Y. Supp. 926; *Stone* v. *Wright Wire Co.*, 199 Mass. 306, 85 N. E. 471; *Calkins* v. *Worth*, 215 Ill. 78, 74 N. E. 81; *Bradley* v. *Wolff*, 40 Misc. Rep. 592, 83 N. Y. Supp. 13; *Flower* v. *Barnekoff*, 20 Or. 132, 25 Pac. 370; *Scudder* v. *Budd*, 52 N. J. Eq. 320, 26 Atl. 904; *Humburg* v. *Lotz*, 4 Cal. App. 438, 88 Pac. 510; *McMullen* v. *Hoffman*, 75 Fed. 547; *Van Tine* v. *Hilands*, 131 Fed. 124; *McElroy* v. *Swope*, 47 Fed. 380; *Boqua* v. *Marshall*, 88 Ark. 373, 114 S. W. 714; *Delmonico* v. *Roudebush*, 5 Fed. 165; *Spier* v. *Hyde*, 92 App. Div. 467, 87 N. Y. Supp. 285; *Reilly* v. *Freeman*, 1 App. Div. 560, 37 N. Y. Supp. 570.)

In conclusion, it is proper to observe, as the pleadings allege, and as the testimony discloses and findings of the lower court set forth, that these three coadventurers jointly entered into an agreement, as alleged in the complaint, and which the court has found was entered into to consummate this deal, which resulted in so great an amount of good to the Goldfield mining district, and which paid so handsomely in profits to the parties undertaking the task of bringing the interests together and thereby avoiding the litigation, which threatened to paralyze the district. The whole case, it appears to us, resolves itself into a pure question of fact, as to whether or not the agreement pleaded in the complaint was entered into by the respective parties, and the lower court having so found that such an agreement was entered into, after a careful, thorough, and exhaustive examination of the evidence in this case, we do not feel justified or warranted on this appeal in setting aside or disturbing the judgment of the lower court based on its findings, heretofore referred to, where the material testimony is so conflicting on the material issues.

Under the pleadings and the principles governing the doctrine of joint adventure, which we have herein discussed, we believe the judgment is amply sustained by the pleadings, evidence, and findings, and we are therefore of the opinion that the judgment of the lower court must be affirmed.

It is so ordered.