CLIFFORD W. PUSEY and LEWIS H. PUSEY, trading as C. W. PUSEY AND SON,

*vs.*

FRANK M. LYNCH.

*Sussex, October 27, 1953.*

*Robert W. Tunnell,* of Tunnell & Tunnell, Georgetown, for plaintiffs.

*Frederick P. Whitney,* Georgetown, for defendant.

SEITZ, Chancellor: Plaintiffs seek an accounting from defendant in connection with a certain timber cutting operation in Sussex County, Delaware.

A chronological narration of the dealings between the parties will help to point up the issues in this most interesting and difficult case.

In the fall of 1949 the defendant paid for a certain tract of standing timber. He and plaintiffs [1] (reference to "plaintiff" will mean Clifford Pusey) entered into the following oral arrangement with respect to that tract: plaintiffs would cut the timber and remove it for sale to the Long Lumber Company which would pay plaintiffs therefor. Plaintiffs would first take $30 per thousand board feet from these payments to cover their expenses in connection with the cutting and removal. Plaintiffs would pay the balance to defendant until defendant was fully reimbursed for the money paid by him for the standing timber. Thereafter the profits over and above the cutting charges would be divided evenly between plaintiffs and defendant. I need not resolve the conflict in the testimony as to whether plaintiffs agreed to share losses because both sides now agree that the transaction involved was a joint adventure and no question of loss is otherwise involved.

Over a period from 1949 until some time in 1952 the plaintiffs and defendant entered into six such agreements, the only difference being that the cutting charge per thousand board feet was constantly increasing due to the increase in labor charges and insurance rates. In none of these six cases was the land itself purchased.

Part of the cutting charge made by plaintiffs was used to pay their own small salaries as well as the wages of the other help. However, it is fair to say that plaintiffs' real profit came from the division of the proceeds after paying all expenses and reimbursing defendant for the purchase price of the timber. Plaintiffs supplied all the tractors, trucks and sawmill to do these various jobs. They collected all the money from the Long Lumber Company, kept the accounts and made payments and distributions from time to time. The only thing defendant did was advance the purchase price.

---

1. The defendant said he contracted only with one of the plaintiffs, but I attach no legal significance to this fact here.

Plaintiffs and defendant completed the work in connection with the six tracts of timber without any difficulty and reference to these prior transactions is made in order to understand the controversy here involved which surrounds the seventh transaction—the so-called "Hitch Tract".

Some time in 1951 one of the plaintiffs "discovered" a tract of timber for sale known as the Hitch Tract, covering well over 200 acres. Defendant testified that "he" bought the land and timber. Plaintiff says "they" bought it. Defendant was out of town when action to seal the purchase became a matter of necessity and plaintiffs gave a down payment to bind the purchase. Thereafter defendant paid the $15,000 purchase price and the deed was made out in his name alone.

Plaintiffs and defendant made the same arrangement, financial and otherwise, with respect to the Hitch Tract as had been made on the previous tracts, except that plaintiffs and defendant agreed that the cutting charge for the Hitch Tract would be $37.50 per thousand board feet. It was also agreed that the land was to be evenly divided after the timber had been cut.

Plaintiffs commenced cutting in January 1952. After substantial cutting plaintiffs were unable to make expenses even at $37.50 per thousand because of the increase in labor and insurance charges and the location of the timber. Plaintiff also appeared to have personal reasons for quitting. As hereafter noted the parties are in disagreement as to the circumstances under which plaintiffs on July 14 shut down operations completely and finally. Up to this time plaintiffs had cut and sold approximately 200,000 board feet of timber from the Hitch Tract. Plaintiffs also had in the bank, over and above cutting expenses, the sum of $2,287.62. Plaintiffs agree that this money must be considered in the accounting. Moreover, $2,000 had been paid to defendant on account of the purchase price of the timber and land.

Plaintiff testified that thereafter, at various times, he attempted to get the defendant to straighten out the matter and defendant told him that it would be done after the first of the year. Plaintiff also

testified that defendant told him he could get $23,000 for the remaining standing timber and the land and asked plaintiff what he thought of it. Plaintiff said he told defendant to sell because he (plaintiff) could use the money. Defendant admitted that he asked plaintiff in September 1952 what he thought of a $20,000 offer he (defendant) had received for the timber but his testimony leaves some doubt as to whether he denied plaintiff's version. I find that defendant appeared to recognize that plaintiffs had some interest in the property.

In September 1952 defendant sold the remaining standing timber for $20,500 and gave an option to the same party to purchase the land for $2,500. As far as is known the option has never been exercised, but the $20,500 for the timber has presumably been received. In February 1953 defendant for the first time said that there would be no settlement because plaintiff walked out on him.

Plaintiffs say that defendant is entitled to be paid the balance of the purchase price advanced by him ($13,000); that the amount over and above that sum, being $9,787.62, should be evenly divided between plaintiffs and defendant; and that the land is owned by them equally.

Defendant's answer took the position that an employer-employee relationship existed between plaintiff and defendant. But defendant argues in his brief that the Hitch transaction involved a joint adventure and that plaintiffs are not entitled to any of the profits accruing after they abandoned it without defendant's consent, citing 48 *C.J.S. Joint Adventures*, § 4 (default by other party). Plaintiffs' brief agrees that it may be treated as a joint adventure. I shall therefore proceed on the premise that we have here a joint adventure. Plaintiff states that the credible evidence shows that defendant not only agreed that plaintiffs should stop cutting but also agreed to sell the land and timber and divide the profits.

The agreement under which these coadventures operated was completely oral and so we must look entirely to the oral testimony to decide the rights of the parties in the property purchased at the inception of their relationship. I shall proceed to state the best reading I can give the evidence.

In substance, the parties agreed that the defendant would advance the money to purchase the land and timber. Plaintiffs agreed to cut the timber at a fixed rate and use the excess money to reimburse defendant to the extent of the purchase price and thereafter the net profits would be evenly divided.

Defendant had nothing to do except advance the money and receive money payments from plaintiffs. Defendant himself testified that he entered into such agreements because it was a means of getting a higher rate of interest than he could obtain from a bank.

I conclude that whether or not one starts with a presumption,[2] the fair inference from the record is that defendant was only advancing the purchase money to the cause of the joint adventure and that the coadventurers "owned" the land and timber subject to defendant's priority as to reimbursement. I say this because, as I view it, defendant was in effect merely lending the purchase price and agreeing to take repayment from the proceeds of sale. Compare *Botsford v. Van Riper,* 33 *Nev.* 156, 110 *P.* 705. I do not here attach any particular significance to the fact that defendant took title in his name. It may be noted that defendant was to be reimbursed for the entire purchase price which necessarily included the price of the land. At best the purchase of the land was incidental to the purchase of the timber. No statute of frauds question is raised.

Since I have concluded that plaintiffs actually were the equitable co-owners of the land and timber, plaintiffs did not thereby forfeit their property interest therein. True, defendant is entitled to full reimbursement for his purchase money loan. Under other circumstances he might also be entitled to damages.[3] But here I believe the defendant consented when plaintiffs ceased operations and so no question of damages is involved. However, equity requires that defendant as a coadventurer be reimbursed for any costs occasioned by plaintiffs' action in terminating their cutting.

2. Thus I need not reconcile, if reconciliation be needed, the presumption principle announced in 48 *C.J.S., Joint Adventures,* § 7(4), *at page* 833, with the principle found in *Martin v. Morrison, Tex.Civ.App.,* 260 *S.W.* 893, 894; 17 *Ann.Cas.* 1023.

3. Compare 48 *C.J.S., Joint Adventures,* § 4, *page* 821.

Plaintiffs are therefore entitled to receive their net share from the sale price of the remaining timber, less any costs caused by plaintiffs' abandonment, plus an undivided one-half interest in the real estate.

Order on notice.